IN THE SUPREME COURT OF APPEALS OF WEST VIRGINIA

January 2018 Term

No. 17-0777

**FILED**

**February 15, 2018**

**released at 3:00 p.m.**
EDYTHE NASH GAISER, CLERK
SUPREME COURT OF APPEALS
OF WEST VIRGINIA

*In re* J. G., II

Appeal from the Circuit Court of McDowell County
The Honorable Booker T. Stephens, Judge
Case No. 14-JA-081

REVERSED AND REMANDED WITH DIRECTIONS

Submitted:  January 23, 2018
Filed:  February 15, 2018

William O. Huffman, Esq.
Princeton, West Virginia
Attorney for Petitioners S. L. and S. L.


Ronald D. Hassan, Esq.
Welch, West Virginia
Attorney for Respondent J. G.


R. Keith Flinchum, Esq.
Princeton, West Virginia
Attorney for Respondent T. S.

Patrick Morrisey, Esq.
Attorney General
Melinda C. Dugas, Esq.
Assistant Attorney General
Charleston, West Virginia
Attorney for West Virginia
Department of Health and
Human Resources

Philip A. LaCaria, Esq.
Welch, West Virginia
Guardian ad Litem for J. G., II

JUSTICE WORKMAN delivered the Opinion of the Court.

SYLLABUS BY THE COURT

1.    "Although conclusions of law reached by a circuit court are subject to *de novo* review, when an action, such as an abuse and neglect case, is tried upon the facts without a jury, the circuit court shall make a determination based upon the evidence and shall make findings of fact and conclusions of law as to whether such child is abused or neglected. These findings shall not be set aside by a reviewing court unless clearly erroneous. A finding is clearly erroneous when, although there is evidence to support the finding, the reviewing court on the entire evidence is left with the definite and firm conviction that a mistake has been committed. However, a reviewing court may not overturn a finding simply because it would have decided the case differently, and it must affirm a finding if the circuit court's account of the evidence is plausible in light of the record viewed in its entirety."  Syl. Pt. 1, *In re Tiffany Marie S.*, 196 W. Va. 223, 470 S.E.2d 177 (1996).

2.    "Pursuant to West Virginia Code § 49-6-12(g) (1998), before a circuit court can grant an extension of a post-adjudicatory improvement period, the court must first find that the respondent has substantially complied with the terms of the improvement period; that the continuation of the improvement period would not substantially impair the ability of the Department of Health and Human Resources to permanently place the child; and that such extension is otherwise consistent with the best interest of the child."  Syl. Pt. 2, *In re Jamie Nicole H.*, 205 W. Va. 176, 517 S.E.2d 41 (1999).

i

3. "At the conclusion of the improvement period, the court shall review the performance of the parents in attempting to attain the goals of the improvement period and shall, in the court's discretion, determine whether the conditions of the improvement period have been satisfied and whether sufficient improvement has been made in the context of all the circumstances of the case to justify the return of the child." Syl. Pt. 6, *In re Carlita B.*, 185 W. Va. 613, 408 S.E.2d 365 (1991).

4. "Child abuse and neglect cases must be recognized as being among the highest priority for the courts' attention. Unjustified procedural delays wreak havoc on a child's development, stability and security." Syl. Pt. 1, in part, *In re Carlita B.*, 185 W. Va. 613, 408 S.E.2d 365 (1991).

5. "In the law concerning custody of minor children, no rule is more firmly established than that the right of a natural parent to the custody of his or her infant child is paramount to that of any other person; it is a fundamental personal liberty protected and guaranteed by the Due Process Clauses of the West Virginia and United States Constitutions." Syl. Pt. 1, *In re Willis*, 157 W. Va. 225, 207 S.E.2d 129 (1973).

6. "Although parents have substantial rights that must be protected, the primary goal in cases involving abuse and neglect, as in all family law matters, must be the health and welfare of the children." Syl. Pt. 3, *In re Katie S.*, 198 W. Va. 79, 479 S.E.2d 589 (1996).

7.      "In a contest involving the custody of an infant the welfare of the child is the polar star by which the discretion of the court will be guided." Syl. Pt. 2, *State ex rel. Lipscomb v. Joplin*, 131 W. Va. 302, 47 S.E.2d 221 (1948).

8.      "'[C]ourts are not required to exhaust every speculative possibility of parental improvement before terminating parental rights where it appears that the welfare of the child will be seriously threatened. . . .'" Syl. Pt. 7, in part, *In re Carlita B.*, 185 W. Va. 613, 408 S.E.2d 365 (1991).

9.      "When parental rights are terminated due to neglect or abuse, the circuit court may nevertheless in appropriate cases consider whether continued visitation or other contact with the abusing parent is in the best interest of the child. Among other things, the circuit court should consider whether a close emotional bond has been established between parent and child and the child's wishes, if he or she is of appropriate maturity to make such request. The evidence must indicate that such visitation or continued contact would not be detrimental to the child's well being and would be in the child's best interest." Syl. Pt. 5, *In re Christina L.*, 194 W.Va. 446, 460 S.E.2d 692 (1995).

10.      "A permanency plan for abused and neglected children designating their permanent placement should generally be established prior to a determination of whether post-termination visitation is appropriate." Syl. Pt. 6, *In re Billy Joe M.*, 206 W. Va. 1, 521 S.E.2d 173 (1999).

WORKMAN, J.:

Petitioners/foster parents S. L. and S. L.[1] (hereinafter "petitioners"), appeal the Circuit Court of McDowell County's August 25, 2017, disposition order in this abuse and neglect proceeding, which required the gradual transition of infant J. G., II back to the physical custody of his biological parents, respondents J. G. and T. S. Petitioners assert that the circuit court erred in failing to comply with the statutory time frames required for abuse and neglect proceedings and further abused its discretion in returning the infant to his biological parents. The Department of Health and Human Resources (hereinafter "DHHR") and the guardian ad litem concur that the circuit court abused its discretion in returning the infant to his parents.

Upon careful review of the briefs, the appendix record, the arguments of the parties, and the applicable legal authority, we find that the circuit court erred in failing to comply with the statutory requirements of West Virginia Code § 49-4-610 (2015) and the West Virginia Rules of Procedure for Child Abuse and Neglect. We further find that the circuit court abused its discretion in failing to terminate respondents' parental rights and ordering return of the infant to their care and physical custody. Therefore, we reverse the circuit court's disposition in this matter and remand this case with directions to the circuit

---

[1] Consistent with our practice in cases involving sensitive facts, we identify the parties by initials only. *See In re Jeffrey R.L.*, 190 W.Va. 24, 26 n.1, 435 S.E.2d 162, 164 n.1 (1993).

1

court to terminate respondents' parental rights, attain permanency for the infant, and conduct any and all further proceedings, as necessary and appropriate.

## I. FACTS AND PROCEDURAL HISTORY

J. G., II was born to respondents T. S. and J. G. at thirty-four weeks' gestation with opiates, marijuana, and benzodiazepines in his system. Based on T. S.'s prior involuntary termination of parental rights to a child due to substance abuse and domestic violence and the presence of drugs in J. G., II's system, an abuse and neglect petition was filed by DHHR on December 29, 2014.[2] J. G., II was placed into a variety of foster homes in his early weeks and was ultimately placed with petitioners on February 11, 2015, when he was six weeks old. He remains in their care to date.[3] Due to his prematurity and the drugs in his system, J. G., II has special needs requiring medical monitoring and treatment including ear, nose and throat difficulties, feeding/weight gain, and hypertonicity.

Respondents waived a preliminary hearing and while awaiting a March 10, 2015, adjudicatory hearing, they cancelled multiple visits, frequently fell asleep during the visits they did attend, failed to return calls from DHHR, and had multiple positive drug

---

[2] A DNA test confirming J. G. as the infant's father would soon follow, whereupon he was added as an adult respondent.

[3] This Court stayed the circuit court's disposition order returning J. G., II to respondents pending the outcome of this appeal.

screens. Nevertheless, at the March 10, 2015, hearing, the circuit court granted a six-month

pre-adjudicatory improvement period. The DHHR apparently provided a report to the

circuit court prior to the subsequent ninety-day hearing indicating the respondents were not

cooperating with services; [4] accordingly, the circuit court ordered that respondents

cooperate with services and set an adjudicatory hearing for July 30, 2015.[5] The July 30,

hearing was continued to August 20 and the circuit court again entered an order requiring

respondents to cooperate with drug screens. The day before the August 20, 2015,

adjudicatory hearing, the DHHR advised the circuit court that respondents were

cooperating "only minimally" with services and were difficult to contact; DHHR requested

adjudication since the improvement period "appear[ed] to have been a failure."

For reasons that do not appear in the record or in its order, the court continued

the August 20 adjudicatory hearing until September 16, 2015. Further, the appendix record

contains no transcript of the September 16, 2015, hearing; however, in an order arising

---

[4] This letter is not contained in the appendix record.

[5] In the interim, respondents underwent psychological evaluations. T. S.'s evaluation found that her prognosis for "reliable attainment of minimally adequate parenting is considered highly guarded to poor due to likelihood of substance abuse relapse and recalcitrance of personality issues to change." She reported a history of schizophrenia, bipolar disorder, anxiety, and depression. Her evaluation further revealed that she denied using drugs during her pregnancy, but the record reveals that she later stated to a case worker that her marijuana use during pregnancy likely saved the infant's life due to her morning sickness. J. G.'s evaluation found that his potential for adequate parenting was "fair in his own right" but likely to be negatively affected by T. S. if they stayed together.

3

from the hearing, the circuit court stated that respondents "have demonstrated the likelihood to fully participate in [an] improvement period" and therefore granted *another* six-month improvement period, apparently upon oral motion.[6]

Thereafter, respondents continued to have positive drug screens. A DHHR summary stated that respondents "will over medicate either night before or morning of visits, which will result in one being unable to attend due to an 'illness'" and noted they were being evicted. A visit just before a November 19, 2015, status hearing was cancelled due to a physical altercation between respondents, which resulted in J. G. being arrested. Days before the hearing, respondents again tested positive for a combination of opiates, benzodiazepiness, and suboxone. A letter from DHHR the day before the hearing stated that there had been domestic violence incidents each month since the last hearing, resulting in charges to each respondent. At the November 19, 2015, hearing, the circuit court set adjudication for December 10, 2015, noting the respondents' continued positive drug screens.

Respondents appeared at the December 10, 2015, hearing in an impaired state. The DHHR advised that respondents continued to test positive in the drug screens in which they actually participated, but that T. S. noted that there was no reason to attend them because "her rights were going to be terminated." The DHHR noted respondents

---

[6] The DHHR's status letter is not contained in the appendix record. The docket sheet reveals no written motion for an additional improvement period.

4

were living in hotels and about to be evicted from their most recent home. The circuit court continued the adjudicatory hearing to December 16, 2015, at which time both respondents stipulated to substance abuse resulting in abuse and neglect. The DHHR noted that the drug screens were "just as bad if not worse" than at the outset of the case and that the case had been "dragging." The guardian ad litem concurred that there was no improvement. Nevertheless, the circuit court granted yet another six-month post-adjudicatory improvement period upon oral motion[7] over the objection of the guardian ad litem and DHHR. The order states that respondents "have demonstrated the likelihood to fully participate in the improvement period" and that although "[a]n earlier improvement period was granted[,] . . . there has been a substantial change in circumstances supporting the likelihood of full participation in a further improvement period." The order does not note what those changes in circumstances were.[8]

Shortly before the next status hearing, the DHHR noted that both parents were admitted to rehabilitation facilities, but continued to have positive drug screens until admission. At a July 14, 2016, status hearing, the parties appeared and orally moved for a

---

[7] It appears at least one of the respondents filed a written motion for an improvement period nearly two months later on February 22, 2016, based on the docket sheet. That motion is not included in the appendix record.

[8] The circuit court stated that "this is your last opportunity, as far as I'm concerned. I'm giving you this chance, over the objection of the—of the—of this—of the Petitioner and the Department and the guardian ad litem. . . . Now, if you go there and you don't get it right, you're going to come right back here and I will not hesitate to terminate your parental rights."

six-month extension of their post-adjudicatory improvement period. The circuit court granted another improvement period, congratulating them on completing rehab and noting they "looked better" than he had previously seen them, and making the improvement period conditional upon respondents obtaining a home.

Shortly after this hearing, petitioner S. L. apparently communicated with the guardian ad litem objecting to overnight visits, noting that J. G., II would be in danger with his parents. And in fact, on October 1, 2016, an incident occurred at the end of an overnight visit. Apparently, a CPS worker arrived at respondents' home to pick up J. G., II and received no answer at the door; she then heard J. G., II screaming and entered the home. She went upstairs and observed large amounts of blood, finding the infant on the bed beside J. G., who was completely unresponsive; T. S. emerged from the bathroom with a large gash over her eye, indicating she had fallen. The infant was in a saturated diaper, screaming and reaching for the CPS worker. The CPS worker reported that T. S. was stumbling and had difficulty speaking; she stated her "eyes were dilated and her pupils were the size of pins. . . . [S]he was high as a kite." It was later discovered that both had stopped attending their AA and NA meetings and neighbors suspected a relapse. The DHHR once again advised the circuit court by written report that the "improvement period has been a failure[.]" The guardian ad litem shortly thereafter requested termination by letter to the circuit court and the DHHR filed a written motion for termination on November 7, 2016.

At the termination hearing of December 15, 2016, respondents contended that they had not relapsed and that the incident of October 1 was the result of J. G.'s appropriate use of prescription medication and T. S.'s vertigo. T. S. admitted, however, to having smoked three joints due to her brother's death in early October. Without explanation, the circuit court stated: "I'm going to give them 90 days to see what happens." The court further gave respondents thirty days to settle into a fourth home which was reportedly located in a "known drug area."

Petitioners thereafter moved to intervene, which motion was granted. At the next status hearing on March 23, 2017, DHHR reported that the family moved into a trailer partially damaged by fire and that supervised visits had been reinitiated. Respondents' preceding three drug screens were positive; however, respondents claimed to have prescriptions to explain the most recent screens and the circuit court decided to wait for confirmation of the preceding day's drug screen, resetting the hearing for April 4, 2017. At the April 4 hearing, respondents continued to maintain that their positive screens were for prescribed medications, with the exception of the "small amount of marijuana."[9] Ultimately, the circuit court stated that "[n]otwithstanding it's been 26, 27 months, I'm going to hold in abeyance the motion to terminate, and you have—I'm going to give you until July. If there are no positive screenings between now and July, I'm inclined then to

_____

[9] The parties went several rounds trying to get T. S. to explain how she tested positive for what she claimed was a "minute" amount of marijuana on March 15 when she denied smoking marijuana since November. She provided no explanation but stated merely "I do my thing, Your Honor."

7

lift the supervised visitations and let you have this child . . . ." The court noted that its ruling was based "on the fact that, actually, we're supposed to work to try and reunite the families, if we can."

The parties returned upon petitioners' motion for permanent placement, which motion contained the recommendation of the Children's Home Society. CHS observed that the infant was bonded with petitioners and called their daughter "sissy." CHS stated that returning J. G., II to respondents "could be traumatizing and risky to [his] stability and safety[.]" Both parents tested positive on three occasions for any combination of hydrocodone, morphine, "extended opiates"; in early July, T. S. tested positive for amphetamines. Respondents continued to attribute these results to prescription medications.[10] Counsel and the circuit court argued at length about the significance of the positive findings, but no evidence of the prescriptions was apparently made part of the record. Respondents further failed to offer any expert testimony regarding the current necessity of the prescriptions or whether the results were within therapeutic limits. For reasons which do not appear on the record, the circuit court ordered the parties to return on August 7, 2017 for its "ruling."

---

[10] T. S. allegedly produced a prescription for Tylenol with codeine filled on April 20, 2017; J. G. allegedly produced a December 2015 prescription for hydrocodone which he filled in November, 2016. T. S.'s counsel argued that her positive amphetamine result was the result of taking non-prescription Claritin-D, which contains pseudoephedrine.

8

On August 7, 2017, testimony was taken at the disposition hearing. Respondents maintained they were drug-free[11] and continued to attribute positive drug screens to prescriptions; they insisted they had obtained adequate housing and were prepared to care for J. G., II and attend to his various medical appointments by J. G. re-obtaining his drivers' license which had apparently expired.[12] Petitioner/foster mother S. L. testified about her desire to adopt J. G., II and explained his various medical issues. She testified that he was set to begin preschool and explained his resistance to visits with his biological parents, as well as sleep disturbances and behavioral disturbances after visits. The CPS worker confirmed anxiety when she went to pick him up for parental visits and again recounted the events of October 1.

The circuit court made no ruling at the time of the disposition hearing, but entered an order eighteen days later on August 25, 2017, noting that the respondents had made "considerable improvements," testing negative for months "except for prescribed

---

[11] T. S. continued to downplay her drug addiction as having contributed to the infant's medical problems, stating that he was born "with a small amount of hydrocodone in his system and a small amount of THC. His Apgar was good. Everything was fine. . . . He was sent to Roanoke Memorial just for precautions. He never had to be in the incubator . . . He was just small, you know, but all my babies are small." She also testified that alcohol was her "main problem."

[12] In a recent update, the DHHR advised J. G. has still not obtained his drivers' license.

9

medication," and ordering gradual transition of J. G., II to their physical care and custody.

Petitioners then filed the instant appeal.

## II. STANDARD OF REVIEW

With regard to our review of abuse and neglect findings, this Court has held:

> Although conclusions of law reached by a circuit court are subject to *de novo* review, when an action, such as an abuse and neglect case, is tried upon the facts without a jury, the circuit court shall make a determination based upon the evidence and shall make findings of fact and conclusions of law as to whether such child is abused or neglected. These findings shall not be set aside by a reviewing court unless clearly erroneous. A finding is clearly erroneous when, although there is evidence to support the finding, the reviewing court on the entire evidence is left with the definite and firm conviction that a mistake has been committed. However, a reviewing court may not overturn a finding simply because it would have decided the case differently, and it must affirm a finding if the circuit court's account of the evidence is plausible in light of the record viewed in its entirety.

Syl. Pt. 1, *In re Tiffany Marie S*., 196 W. Va. 223, 470 S.E.2d 177 (1996). With these

standards in mind, we turn to the petitioners' assignments of error.

## III. DISCUSSION

Petitioners make two assignments of error: 1) that the circuit court erred in

failing to comply with statutory and procedural time limitations for abuse and neglect

proceedings; and 2) that the circuit court abused its discretion in ordering J. G., II to be

returned to his biological parents. We will address each alleged error in turn.

10

## A. STATUTORY AND PROCEDURAL TIME LIMITATIONS

As to their first assignment of error, petitioners focus primarily on the length and propriety of the pre- and post-adjudicatory improvement periods granted to respondents below.[13] Critically, this Court has observed that "[i]mprovement periods are [] regulated, both in their allowance and in their duration, by the West Virginia Legislature, which has assumed the responsibility of implementing guidelines for child abuse and neglect proceedings generally." *In re Emily*, 208 W. Va. 325, 334, 540 S.E.2d 542, 551 (2000). West Virginia Code § 49-4-610 contains comprehensive requirements pertaining to both pre- and post-adjudicatory improvement periods.

As pertains to pre-adjudicatory improvement periods, West Virginia Code § 49-4-610(1) provides, in part:

> (1) **Preadjudicatory improvement period**. — A court may grant a respondent an improvement period of a period *not to exceed three months* prior to making a finding that child is abused or neglected . . . only when:
>
> (A) The respondent files a written motion requesting the improvement period;

---

[13] Petitioners likewise assert that the circuit court's unauthorized pre-adjudicatory improvement periods necessarily resulted in a delay in adjudication. Rule 25 of the Rules of Procedure for Child Abuse and Neglect provides that a final adjudicatory hearing must occur "no later than thirty (30) days, after the conclusion of [a] pre-adjudicatory improvement period." This time standard, along with the limitation on pre-adjudicatory improvement periods, therefore contemplates adjudication no later than four months following the beginning of any pre-adjudicatory improvement period.

11

> (B) The respondent demonstrates, by clear and convincing evidence, that the respondent is likely to fully participate in the improvement period . . . .

(emphasis added). *See also* West Virginia Rule of Procedure for Child Abuse and Neglect 23(b) ("Pursuant to W. Va. Code § 49-4-610, a preadjudicatory improvement period shall not exceed three months."). In the instant case, the circuit court ordered *two six*-month pre-adjudicatory improvement periods, both of which were obviously in violation of the statute and Rule.

Moreover, not only did the circuit court err in the length and number of pre-adjudicatory improvement periods, it plainly gave little to no consideration to whether respondents had demonstrated "by clear and convincing evidence" the likelihood of full participation. The record reveals that before ordering the initial improvement period, respondents cancelled multiple visits with J. G., II, fell asleep during visits, failed to return calls from DHHR, and had multiple positive drug screens. Before the *second* pre-adjudicatory improvement period, respondents continued the same minimal participation and continued to test positive for illicit substances. DHHR repeatedly advised the circuit court that the improvement period was a failure. Notwithstanding the clear and convincing evidence *to the contrary*, the circuit court twice entered orders stating that respondents had "demonstrated the likelihood to fully participate in the improvement period."

12

As to the post-adjudicatory improvement periods, the circuit court granted two "formal" improvement periods of six months each, along with general continuances of the "status quo" of the improvement periods such that the respondents continued in a general improvement period for a total of twenty months from the time of the adjudication until disposition. This is plainly in violation—in both duration and procedure—of West Virginia Code § 49-4-610(2), which provides, in pertinent part:

> (2) **Post-adjudicatory improvement period**. — After finding that a child is an abused or neglected child pursuant to section six hundred one of this article, a court may grant a respondent an improvement period of a period *not to exceed six months* when:
>
> (A) The respondent files a *written* motion requesting the improvement period;
>
> (B) The respondent demonstrates, by clear and convincing evidence, that the respondent is likely to fully participate in the improvement period and the court further makes a finding, on the record, of the terms of the improvement period;
>
> \*\*\*
>
> (D) *Since the initiation of the proceeding, the respondent has not previously been granted any improvement period or the respondent demonstrates that since the initial improvement period, the respondent has experienced a substantial change in circumstances.* Further, the respondent shall demonstrate that due to that change in circumstances the respondent is likely to fully participate in a further improvement period . . . .

(emphasis added).

13

As plainly stated therein, West Virginia Code § 49-4-610(2) permits a post-adjudicatory improvement period not to exceed *six* months, upon *written* motion, and only if there is a demonstration, *by clear and convincing evidence*, that the individual is likely to fully participate *and* no prior improvement period has been granted. In this case, no written motion was filed at the time the circuit court granted the improvement period and respondents had demonstrated—repeatedly—their refusal to participate in the improvement period. It was, in fact, this refusal that finally prompted the inexplicably reluctant and recalcitrant circuit court to finally proceed to adjudication.

Further, in view of the fact that a total of *twelve* months of pre-adjudicatory improvement period had previously been granted, respondents herein were required to additionally show a substantial change in circumstances warranting a post-adjudicatory improvement period and that *because of that substantial change*, they were likely to participate: "[R]espondent [must] demonstrate[] that since the initial improvement period, the respondent has experienced a substantial change in circumstances[] . . . [and] due to that change in circumstances the respondent is likely to fully participate in a further improvement period[.]" W. Va. Code § 49-4-610(2)(D). The circuit court's order granting the improvement period does in fact state that respondents "demonstrated the likelihood to fully participate" and that "there has been a substantial change in circumstances supporting the likelihood of full participation[.]" However, both the transcript and order fail entirely to identify what that change was and why it supported the likelihood of full participation.

14

In this case, the guardian ad litem reported no improvement in the respondents' behavior since the outset and the DHHR noted that the drug screens were "just as bad if not worse[.]"

The second six-month post-adjudicatory improvement period ordered below was likewise in violation of statutory and procedural requirements. West Virginia Code § 49-4-610(6) provides that an extension of a post-adjudicatory improvement period is permitted "for a period not to exceed *three* months" and requires the court to find that such continuation "will not substantially impair the ability of the department to permanently place the child and that the extension is otherwise consistent with the best interest of the child." (emphasis added). To that end, this Court has held that findings in support of each of these criteria are mandatory:

> Pursuant to West Virginia Code § 49-6-12(g) (1998), before a circuit court can grant an extension of a post-adjudicatory improvement period, the court must first find that the respondent has substantially complied with the terms of the improvement period; that the continuation of the improvement period would not substantially impair the ability of the Department of Health and Human Resources to permanently place the child; and that such extension is otherwise consistent with the best interest of the child.

Syl. Pt. 2, *In re Jamie Nicole H.*, 205 W. Va. 176, 517 S.E.2d 41 (1999).

15

No such findings were made upon granting the second improvement period or at any time thereafter when the improvement period continued generally.[14] Respondents continued to have positive drug screens three months into the first improvement period until placed into rehab; such behavior is hardly demonstrative of "substantial compliance" with the prior improvement period. Moreover, the circuit court failed at any time to consider whether the general continuation of the post-adjudicatory improvement periods were consistent with the best interests of the child. The record before us and paucity of statutorily-compliant findings by the circuit court leave us with no other conclusion than the circuit court sought to place the interests of respondents above the health and welfare of J. G., II. We are compelled to observe that it was within this second, wholly unsubstantiated improvement period that the October 1 incident involving respondents' incapacitation while caring for the infant occurred. Had the circuit court complied with the statutory and procedural requirements plainly set forth in West Virginia Code § 49-4-610 and acknowledged that respondents' incorrigible behavior failed to satisfy the criteria required to entitle one to an improvement period, J. G., II would never have been subjected to such a traumatizing event.

---

[14] In fact this particular order states "[s]ince the initiation of these proceedings, an improvement period *has not* previously been granted to the Respondents." (emphasis added). While undoubtedly the result of utilizing the wrong form, this error demonstrates how little regard was given the statutory requirements regarding improvement periods. Orders entered pursuant to the statutory requirements are not to be entered *pro forma* and must accurately and substantively address the necessary findings.

Finally, as pertains to extensions of post-adjudicatory improvement periods, we note that the requirement that such improvement period not "impair the ability of the department to permanently place the child" holds particular significance, as well-demonstrated in the instant case. Here, the circuit court's perpetual continuance of the improvement periods resulted in J. G., II being in foster care for a total of thirty-two months as of the time the disposition order was entered.[15] This occurrence alone squarely implicates the ultimate time limitation for improvement periods contained in West Virginia Code § 49-4-610(9):

> Notwithstanding any other provision of this section, no combination of any improvement periods or extensions thereto may cause a child to be in *foster care more than fifteen months* of the most recent twenty-two months, unless the court finds compelling circumstances by clear and convincing evidence that it is in the child's best interests to extend the time limits contained in this paragraph.

(emphasis added). Before the first post-adjudicatory improvement period ended, J. G., II had been in foster care for fifteen months. Not only did the circuit court fail to make the findings required for any *individual* improvement period or extension thereof, it similarly failed to make any findings required to continue granting an aggregate of improvement periods which extended past this fifteen-month benchmark. In fact, the circuit court

---

[15] Moreover, our ultimate determination to leave J. G., II with his foster family in no way mitigates the delay which occurred in this matter. Lack of permanency is without a doubt psychologically harmful to children irrespective of their age and/or awareness of the proceedings given the profound impact this uncertainty has on their caregivers, daily surroundings, and routine. Unwarranted delay in obtaining permanency merely compounds the circumstances which gave rise to the abuse and neglect petition in the first instance.

17

continued generally the improvement period for nearly an additional year and a half after the first post-adjudicatory improvement period.

As the timeline of this case demonstrates, respondents continually engaged in domestic violence, had positive drug screens, and unstable housing throughout the virtual entirety of the improvement periods, not to mention the egregious failure of supervision and care during the October 1 incident involving the infant. The circuit court below disregarded in both letter and intent the statutory language and this Court's clear holdings regarding its obligation relative to improvement periods:

> At the conclusion of the improvement period, the court shall review the performance of the parents in attempting to attain the goals of the improvement period and shall, in the court's discretion, determine whether the conditions of the improvement period have been satisfied and whether sufficient improvement has been made in the context of all the circumstances of the case to justify the return of the child.

Syl. Pt. 6, *Carlita B*., 185 W. Va. 613, 408 S.E.2d 365.

For reasons that utterly confound this Court, the circuit court perpetually allowed respondents opportunity after opportunity to modify their behavior, which they repeatedly rejected. Only in the approximate six months before the long-overdue disposition did respondents begin to engage in slightly more stable behavior. However, they continued to test positive for drugs for which there was limited to no evidence as being related to appropriate prescription medication usage. Critically, "[a] parent's rights are necessarily limited . . . [as to improvement periods] because the pre-eminent concern in

18

abuse and neglect proceedings is the best interest of the child subject thereto." *Emily*, 208 W. Va. at 336, 540 S.E.2d at 553.

To whatever extent our expansive body of caselaw regarding the circuit court's paramount duties in cases of abuse and neglect is unclear, let us now lay the matter squarely to rest. The procedural and substantive requirements of West Virginia Code § 49-4-601 *et seq*., the Rules of Procedure for Child Abuse and Neglect, and our extensive body of caselaw are not mere guidelines. The requirements contained therein are not simply window dressing for orders which substantively fail to reach the issues and detail the findings and conclusions necessary to substantiate a court's actions. The time limitations and standards contained therein are mandatory and may not be casually disregarded or enlarged without detailed findings demonstrating exercise of clear-cut statutory authority. Discretion granted to the circuit court within this framework is intended to allow the court to fashion appropriate measures and remedies to highly complex familial and inter-personal issues—it does not serve as a blanket of immunity for the circuit court to manage abuse and neglect cases as its whim, personal desire, or docket may fancy. "Child abuse and neglect cases must be recognized as being among the highest priority for the courts' attention. Unjustified procedural delays wreak havoc on a child's development, stability and security." Syl. Pt. 1, in part, *Carlita B*., 185 W.Va. 613, 408 S.E.2d 365. The circuit court's inexplicable penchant for "kicking the can" down the proverbial road in this matter

19

flies directly in the face of every directive enacted by the Legislature and articulated by

this Court as pertains to the timely disposition of abuse and neglect matters.[16]

This Court is not unsympathetic to the difficult task of procedurally

managing the unfortunate volume of abuse and neglect cases, while weighing the

significant interests and life-altering decisions necessary in these matters. We have noted

that "[b]oth the statute and our case law grant trial courts considerable flexibility in

developing meaningful improvement periods designed to address the myriad possible

problems causing abuse and neglect." *Amy M.*, 196 W. Va. at 258, 470 S.E.2d at 212.

Nevertheless,

> [a]lthough it is sometimes a difficult task, the trial court must accept the fact that the statutory limits on improvement periods (as well as our case law limiting the right to improvement periods) dictate that there comes a time for decision, because a child deserves resolution and permanency in his or her life, and because part of that permanency must include at minimum a right to rely on his or her caretakers to be there to provide the basic nurturance of life.

---

[16] In addition to the time standards argued by petitioners, it appears from the appendix record that the circuit court (and DHHR) failed to timely adhere to several other requirements, but those are largely subsumed by the excessive and unwarranted improvement periods. For example, DHHR provided letter updates to the circuit court typically only the day before the ninety-day hearing in violation of Rule 37. Additionally, the circuit court appears to have failed to conduct designated permanency hearings as required by Rule 36a and failed to issue its disposition order within ten days of the hearing as required by Rule 36.

*Id.* at 260, 470 S.E.2d at 214.  It is precisely *because* the court's actions in these matters is

so starkly life-altering that it must comply with the carefully curated time requisites and

evidentiary requirements contained in our statutory scheme:

> [T]he early, most formative years of a child's life are crucial to his or her development. There would be no adequate remedy at law for these children were they permitted to continue in this abyss of uncertainty. We have repeatedly emphasized that children have a right to resolution of their life situations, to a basic level of nurturance, protection, and security, and to a permanent placement. *The legislature has recognized this by limiting the extent and duration of improvement periods a court may grant in an abuse and neglect case.*

*Id.* at 257-58, 470 S.E.2d at 211-12 (emphasis added).

Accordingly, we find little difficulty in concluding that the circuit court erred

in disregarding the procedural and substantive requirements pertaining to pre- and post-

adjudicatory improvement periods.  This finding alone permits the Court to vacate the

dispositional order:

> Where it appears from the record that the process established by the Rules of Procedure for Child Abuse and Neglect Proceedings and related statutes for the disposition of cases involving children adjudicated to be abused or neglected has been substantially disregarded or frustrated, the resulting order of disposition will be vacated and the case remanded for compliance with that process and entry of an appropriate dispositional order.

Syl. Pt. 5, *In re Edward B.*, 210 W. Va. 621, 558 S.E.2d 620 (2001).[17]  Frequently, however,

vacation of dispositions and remand for compliance serves only to compound any pre-

existing delay.  In this instance, we find it unnecessary to remand this matter for compliance

with long-expired time frames or further development.  The record presented amply

provides this Court with sufficient basis upon which to vacate the disposition order and

further direct that respondents' rights be terminated, as discussed more fully below.  *See In*

*re Isaiah A.*, 228 W. Va. 176, 184, 718 S.E.2d 775, 783 (2010) (reversing court's refusal

to terminate parental rights and remanding for termination where court "was far more

lenient in the granting of extensions than was warranted by the circumstances" and

continued to extend improvement periods despite "abundant opportunity" for mother to

correct conditions of abuse and neglect).


### B.  DISPOSITION

As noted above, petitioners further contend that, for reasons obvious from

the record, the circuit court compounded its procedural errors and plainly abused its

discretion by ordering that J. G., II be returned to respondents, thereby disregarding the

---

[17] Relief may have more promptly been granted had any of the aggrieved parties availed themselves of this Court's original jurisdiction, as has been suggested:  "Prohibition is available to abused and/or neglected children to restrain courts from granting improvement periods of a greater extent and duration than permitted under West Virginia Code §§ 49-6-2(b) and 49-6-5(c) (1995)."  Syl. Pt. 2, *Amy M.*, 196 W. Va. 251, 470 S.E.2d 205.  Certainly when the circuit court is in such egregious violation of the time standards contained in West Virginia Code § 49-4-601 *et seq.*, prudence and zealous advocacy would suggest that the DHHR and/or guardian ad litem are burdened with seeking such relief.

recommendations of both the DHHR and guardian ad litem. Petitioners argue that the record is clear that "[c]ontinued drug use, domestic violence, missed visits and sporadic cooperation, at best, marred the landscape for more than two and one-half years." Respondents counter merely that they are currently "drug free" and have a significant and undisputed bond with their child, asserting a parent's natural right to custody of his or her child. As is certainly obvious from the preceding discussion, we agree with petitioners' characterization of respondents' lack of progress throughout the pendency of the underlying matter. We address, nonetheless, respondents' claims of more recent improvements and whether such belated efforts inure to their benefit.

As the timeline of this case demonstrates, the circuit court prolonged and ignored the statutory time frames for so long that—well after this matter should have been disposed of—respondents finally began to demonstrate ostensibly improved behaviors. Unquestionably, this Court has held that

> [i]n the law concerning custody of minor children, no rule is more firmly established than that the right of a natural parent to the custody of his or her infant child is paramount to that of any other person; it is a fundamental personal liberty protected and guaranteed by the Due Process Clauses of the West Virginia and United States Constitutions.

Syl. Pt. 1, *In re Willis*, 157 W. Va. 225, 207 S.E.2d 129 (1973). However, that right has necessary and well-established limits: "Although parents have substantial rights that must be protected, the primary goal in cases involving abuse and neglect, as in all family law matters, must be the health and welfare of the children." Syl. Pt. 3, *In re Katie S.*, 198 W.

23

Va. 79, 479 S.E.2d 589 (1996); *see also* Syl. Pt. 2, *State ex rel. Lipscomb v. Joplin*, 131 W. Va. 302, 47 S.E.2d 221 (1948) ("In a contest involving the custody of an infant the welfare of the child is the polar star by which the discretion of the court will be guided.").

We observe that respondents' supposed improvement has only occurred during the last approximate six months of the three-year pendency of this case and lacks compelling support in the record evidence. At the last few hearings conducted in this matter, the parties, counsel, and the circuit court engaged in abject speculation about the significance of respondents' *continued* positive drug screens. While respondents alleged they had prescriptions to support these results, the record contains no evidence of these prescriptions. More importantly, however, even assuming the drug screens resulted from use of prescribed medications, there was no evidence offered to demonstrate that respondents were using the prescription medications for active conditions and in non-abusive dosages.

In particular, the record demonstrates that J. G. tested positive in early 2017 for hydrocodone and hydromorphone purportedly due to a two-year old prescription which he had gotten filled a year later and began using. T. S. insisted that her amphetamine-positive result was due to over the counter allergy medication. She likewise insisted she had a prescription for opioids due to a pulled tooth. However, respondents—both of whom were admitted and well-documented substance abusers—presented no evidence 1) that the results were occasioned by the prescriptions alleged; 2) that they should have still been

24

using those medications at the time of the positive screens, regardless of whether they resulted from legitimate prescriptions at one time; or 3) that the results were within therapeutic, and not abusive, limits.

However, even assuming that respondents' proffered explanations for their more recent drug screens are credible, we find that our caselaw requires us to treat such belated improvement as insufficient to warrant removal of J. G., II from his foster family. J. G., II has lived with his foster family for nearly three years—since he was six weeks old—and is indisputably healthy, thriving, and bonded. West Virginia Code § 49-4-610(9) prohibits perpetual improvement periods which "cause a child to be in foster more than fifteen months of the most recent twenty-two months" absent compelling circumstances. The extended duration of the proceedings below and scant evidence supportive of respondents' belated improvement effectively require this Court to ensure that J. G., II's current foster placement remain undisturbed and that he proceed to obtain permanency in that placement.

We find the situation presented in this case much like that in *In re Hunter H.*, 227 W. Va. 699, 715 S.E.2d 397 (2011). In *Hunter H.*, this Court found that the circuit court erred where it removed an infant from his foster family in favor of his grandmother under highly similar circumstances. In justifying the infant's return to the foster family, the Court explained:

The circuit court fails to mention the strong bond that Hunter developed with his foster family, fails to mention that Hunter referred to his foster parents as "mom" and "dad," and fails to mention that Hunter lived with his foster family for three years.

\*\*\*

There is no dispute that the foster family created a stable, loving environment in which Hunter was growing and thriving. Hunter was placed with his foster family when he was 17 months old and lived with them for three years. He was part of their family and both his guardian ad litem and the only expert witness who testified before the circuit court agreed that it was in his best interests to remain with this family. Even the DHHR, which recommended that he be placed with his grandmother, concluded that Hunter was "well adjusted, growing and thriving," while he was living with his foster family.

*Id.* at 705-06, 715 S.E.2d at 403-04.

Respondents urge this Court to regard their more recent "improvement" as more indicative of future behaviors and parenting abilities than the behaviors demonstrated during the first two-and-a-half years of this matter. However, "'courts are not required to exhaust every speculative possibility of parental improvement before terminating parental rights where it appears that the welfare of the child will be seriously threatened. . . .'" Syl. Pt. 7, in part, *Carlita B.*, 185 W.Va. 613, 408 S.E.2d 365; *see also In re Isaiah A.*, 228 W. Va. 176, 185, 718 S.E.2d 775, 784 (2010) (finding "glimmer of hope" standard inconsistent with the criteria expressly provided by statute). Critically, this Court has held that "[i]n making the final disposition in a child abuse and neglect proceeding, the level of a parent's compliance with the terms and conditions of an improvement period is just one factor to

26

be considered. The controlling standard that governs any dispositional decision remains the best interests of the child." Syl. Pt. 4, *In re B.H.*, 233 W. Va. 57, 754 S.E.2d 743 (2014). We decline to speculate further about respondents' purported late-arriving "improvement" and conclude that the egregious delay in this case and best interests of J. G., II require the Court to vacate the circuit court's dispositional order and remand for termination of respondents' parental rights such that permanency for J. G., II may be attained.

That said, we cannot discount the unrefuted evidence in the record demonstrating that J. G., II— the foregoing notwithstanding—enjoys an emotional bond and loving relationship with respondents. At oral argument, DHHR advised that it would likely support post-termination visitation and certainly this Court has made clear that where circumstances warrant and under suitable conditions, post-termination visitation may be appropriate. This Court has held that

> [w]hen parental rights are terminated due to neglect or abuse, the circuit court may nevertheless in appropriate cases consider whether continued visitation or other contact with the abusing parent is in the best interest of the child. Among other things, the circuit court should consider whether a close emotional bond has been established between parent and child and the child's wishes, if he or she is of appropriate maturity to make such request. The evidence must indicate that such visitation or continued contact would not be detrimental to the child's well being and would be in the child's best interest.

Syl. Pt. 5, *In re Christina L.*, 194 W.Va. 446, 460 S.E.2d 692 (1995). Such continued contact is "not [] a right of the parent, but rather [] a right of the child." *Id*. at 455 n.9, 460 S.E.2d at 701 n.9.

27

We caution, however, that such visitation may only be considered "if it is in the child's or children's best interests, and would not unreasonably interfere with their permanent placement." *Amy M.*, 196 W. Va. at 260, 470 S.E.2d at 214 (1996). Accordingly, "[a] permanency plan for abused and neglected children designating their permanent placement should generally be established prior to a determination of whether post-termination visitation is appropriate." Syl. Pt. 6, *In re Billy Joe M.*, 206 W. Va. 1, 521 S.E.2d 173 (1999).

## IV. CONCLUSION

Based upon the foregoing, we reverse the August 25, 2017, order of the Circuit Court of McDowell County and remand this matter with directions to proceed with termination of respondents' parental rights, attainment of permanency, and consideration of post-termination visitation, if appropriate. The Clerk is directed to issue the mandate contemporaneously herewith.

Reversed and remanded with directions.