# STATE OF WEST VIRGINIA
# SUPREME COURT OF APPEALS

*In re* **M.W.**

**No. 21-0724** (Kanawha County 20-JA-215)

## MEMORANDUM DECISION

Petitioner Father C.W., by counsel Charles Hamilton, appeals the Circuit Court of Kanawha County's August 25, 2021, order terminating his parental rights to M.W.[1] The West Virginia Department of Health and Human Resources ("DHHR"), by counsel Patrick Morrisey and Brittany Ryers-Hindbaugh, filed a response in support of the circuit court's order. The guardian ad litem (guardian), Bryan B. Escue, filed a response on behalf of the child also in support of the circuit court's order. On appeal, petitioner argues that the circuit court erred in terminating his improvement period and terminating his parental rights.

This Court has considered the parties' briefs and the record on appeal. The facts and legal arguments are adequately presented, and the decisional process would not be significantly aided by oral argument. Upon consideration of the standard of review, the briefs, and the record presented, the Court finds no substantial question of law and no prejudicial error. For these reasons, a memorandum decision affirming the circuit court's order is appropriate under Rule 21 of the Rules of Appellate Procedure.

In May of 2020, the DHHR filed a child abuse and neglect petition alleging that petitioner and the mother abused nonprescribed Suboxone and marijuana while caring for then-eight-month-old M.W. and that petitioner engaged in domestic violence with the mother. According to the DHHR, petitioner and the mother had significant drug histories and had been using Suboxone as drug treatment for at least two years. Also, the DHHR workers interviewed the mother's two older children, then-nine-year-old L.R. and five-year-old K.H., who described witnessing incidents of domestic violence, including watching petitioner yell and throw things. Further, the DHHR alleged that the parents failed to take M.W. for routine medical check-ups since her birth, and that the child had an untreated urinary tract infection. Most importantly, the DHHR alleged that while the family

---

[1]Consistent with our long-standing practice in cases with sensitive facts, we use initials where necessary to protect the identities of those involved in this case. *See In re K.H.*, 235 W. Va. 254, 773 S.E.2d 20 (2015); *Melinda H. v. William R. II*, 230 W. Va. 731, 742 S.E.2d 419 (2013); *State v. Brandon B.*, 218 W. Va. 324, 624 S.E.2d 761 (2005); *State v. Edward Charles L.*, 183 W. Va. 641, 398 S.E.2d 123 (1990). Further, the proceedings in the circuit court involved two other children, L.R. and K.H., who are not at issue in this appeal.

was under investigation for the above issues, M.W. presented to the emergency room with a broken leg. The parents claimed that M.W. fell off of a three-foot-tall bed when the mother took her upstairs to co-sleep and while petitioner was downstairs cooking dinner. The treating doctor opined that the injury was inconsistent with the explanation given by the parents because it was a "high intensity fracture on the interior" femur, which was likely caused by being forcefully grabbed by the foot or leg, not the child falling on the floor and onto the leg.

At the preliminary hearing held in June of 2020, M.W.'s treating doctor testified that the parents' explanation of the child falling approximately three feet from the top of the bed and onto a rug was inconsistent with the child's fractured femur. She testified that M.W.'s inner femur and growth plate had fractured, and, as the femur is the strongest bone in the body, a high intensity force would have caused the bone to fracture. She stated that a short linear fall to the floor would not have caused M.W.'s fracture. Additionally, she stated that the location of the fracture was inconsistent with a fall as the outer part of the femur, which would have made impact with the floor, was intact. Finally, the doctor stated that at the time of the injury, M.W. was immobile and only able to raise herself up, thus calling into question how she allegedly crawled across the bed and fell. The court found probable cause that the child was abused and neglected.

The circuit court held a contested adjudicatory hearing in September of 2020 and adjudicated the parents as abusing parents, largely based upon prior testimony at the preliminary hearing that M.W.'s broken leg was caused by nonaccidental injury. Over the objection of the DHHR, the court granted the parents post-adjudicatory improvement periods, the terms of which required them to participate in a drug treatment program, complete parenting and adult life skills education classes, attend domestic violence classes, exercise supervised visitations, and submit to drug screening.

In January of 2021, the court held a review hearing, wherein the DHHR reported that petitioner and the mother had been substantially complying by regularly drug screening and completing their domestic violence classes. As such, the court continued their improvement periods and granted increased and unsupervised visitations.

The parents underwent parental fitness and psychological evaluations in March of 2021. Among the records reviewed by the evaluator was a police report, which showed several inconsistencies in the parents' statements to the DHHR and the police regarding M.W.'s broken leg. In the mother's statement to the police, she claimed M.W. fell when she left the room and not while the child was sleeping with her. Also in the police report, the mother stated that prior to M.W.'s fall, petitioner was also in bed with her and the child but went downstairs to sleep on the couch. This statement differed from prior statements given to DHHR workers that petitioner had been downstairs the entire time making dinner. Also, the mother told the police that the couple had at least four arguments during which petitioner violently grabbed M.W. from her arms. Additionally, the evaluation noted that the maternal grandmother reported that the mother called her crying after M.W. was taken to the emergency room and stated that petitioner had placed M.W. with her when she was asleep and that she did not know that the child was in bed with her when M.W. fell. This statement is different from prior statements to the DHHR workers that the mother took the child upstairs to co-sleep. Petitioner's statements to the police and DHHR workers were

more consistent. He stated that he was not in the room when the child fell and denied all domestic violence allegations.

During the interview with the evaluator, petitioner continued to claim that the child fell off of the bed but admitted that he was not present for the incident. Petitioner conceded that he had arguments with the mother but denied any physical altercations. As petitioner denied all wrongdoing, including a lack of supervision and despite evidence that M.W.'s injury was nonaccidental, the evaluator opined that petitioner's prognosis for improved parenting was poor.

Also in March of 2021, the parents attended a visit at the DHHR's office, and, according to the child's caretaker,[2] petitioner acted inappropriately by cussing at her when she refused to immediately hand M.W. over and instead took the child directly into the building. She stated that M.W. clung to her and would not let go, and that petitioner grabbed the caretaker's arm to try to pull M.W. off. The caretaker also reported that a prior visit with M.W. had been cut short because M.W. would not stop crying and hyperventilating until she was returned to the caretaker and foster mother. According to the visitation provider's report, he did not witness the altercation because he was outside waiting on petitioner to return to the car to carry items inside the building, but he never returned. The provider stated that immediately after that visit, the parents complained that they wanted another provider, petitioner opened the car door while it was still moving, and he then "stormed off" into the house. The parents left their things in the provider's vehicle, forcing the provider to unload the car and set the items on the porch. The provider explained that when he tried to leave, petitioner's dog kept trying to get into the car. The provider took the dog to the porch and knocked on the door to get petitioner to secure it. When petitioner answered the door, he yelled at the dog, which scared it and caused it to run under the provider's car. When the provider pulled away, the dog emerged, and petitioner grabbed it and yelled at it while he went back inside the home.

In response to the visitation incident, the court appointed special advocate ("CASA") filed a report recommending that the parents' visits cease. The report stated, "it gravely concerns this CASA that [petitioner] was trying to physically remove [M.W.] from someone's arms, given the unexplained broken leg that [she] suffered." The CASA worried that petitioner had repeated the actions that led to M.W.'s broken leg and that petitioner's cussing at the caretaker and grabbing M.W. occurred in the other children's presence. In light of this behavior and petitioner's failure to acknowledge any wrongdoing, the CASA opined that his improvement period should be terminated.

The court held a review hearing in mid-March of 2021, and reviewed the parents' psychological evaluations, the DHHR's summaries, as well as the CASA report. The DHHR moved to terminate petitioner and the mother's improvement periods, while the guardian moved to suspend visitation only. The court held the motion to terminate improvement periods in abeyance but suspended all visitation.

In May and June of 2021, the circuit court held an evidentiary hearing regarding the DHHR's motions to terminate the parents' improvement periods. The child's caretaker testified

---

[2]This individual is the daughter of the foster parent and often helps care for the children.

consistently with her prior statements in the DHHR and CASA's reports. Next, a Child Protective Services worker testified that she was in the lobby of the DHHR building and witnessed the incident between petitioner and the caretaker. She corroborated the caretaker's testimony and stated that petitioner called the caretaker a "stupid f**king b**ch," stated that M.W. was not her daughter, and asserted that the caretaker was being mean to him. She stated that petitioner was very angry and agitated and yelled at the caretaker in front of everyone. Petitioner testified that when he attempted to take M.W., the caretaker jerked the baby away. He denied cussing at the caretaker, yelling, or otherwise acting inappropriately. The court concluded that the evidence that petitioner acted dangerously and inappropriately at the visitation was more credible than his self-serving testimony. Accordingly, the court terminated petitioner's improvement period and set the matter for disposition.

The court held the final dispositional hearing in July of 2021. The ongoing DHHR worker testified that although the parents substantially complied with services, petitioner had clearly not addressed his anger management issues. She stated that petitioner continued to deny any wrongdoing despite being faced with expert medical testimony that M.W.'s broken leg was a nonaccidental injury. Petitioner testified and continued to deny that he deliberately hurt M.W. or had engaged in domestic violence. The CASA testified that she recommended termination of the parents' parental rights considering the visitation incident, and that the parents continued to deny any wrongdoing. After hearing testimony, the circuit court noted that the matter concerned a very serious injury to an infant, that the parents continued to deny any wrongdoing despite evidence of the child's nonaccidental injury, that petitioner's behavior was very concerning in light of the unknown origin of M.W.'s broken leg, and that the parents had not shown sufficient improvement to justify additional reunification services. The court terminated petitioner and the mother's parental rights upon finding that there was no reasonable likelihood that they could correct the conditions of abuse and neglect in the near future and that termination was necessary for the child's welfare. Petitioner appeals the circuit court's August 25, 2021, dispositional order terminating his parental rights.[3]

The Court has previously established the following standard of review in cases such as this:

> "Although conclusions of law reached by a circuit court are subject to *de novo* review, when an action, such as an abuse and neglect case, is tried upon the facts without a jury, the circuit court shall make a determination based upon the evidence and shall make findings of fact and conclusions of law as to whether such child is abused or neglected. These findings shall not be set aside by a reviewing court unless clearly erroneous. A finding is clearly erroneous when, although there is evidence to support the finding, the reviewing court on the entire evidence is left with the definite and firm conviction that a mistake has been committed. However, a reviewing court may not overturn a finding simply because it would have decided the case differently, and it must affirm a finding if the circuit court's account of the evidence is plausible in light of the record viewed in its entirety." Syl. Pt. 1, *In Interest of Tiffany Marie S.*, 196 W.Va. 223, 470 S.E.2d 177 (1996).

---

[3]As the mother's parental rights were also terminated, the permanency plan for M.W. is adoption by a kinship placement.

Syl. Pt. 1, *In re Cecil T.*, 228 W. Va. 89, 717 S.E.2d 873 (2011).

On appeal, petitioner argues that the circuit court erred in terminating his improvement period when he substantially complied with its terms and conditions. According to petitioner, by January of 2021, the court had granted increased visitations in light of the parents' substantial compliance with services. Petitioner contends that he had all negative drug screens, completed parenting and domestic violence classes, attended drug treatment, obtained employment, completed a psychological evaluation, and had participated in numerous visits at the time of the visitation incident. He concedes only that a "disputed incident occurred that allegedly involved some foul language and shouting, when the child was transferred," yet notes that he was allowed to proceed with the visitation despite these concerns. Petitioner argues that his performance during his improvement period was not taken into consideration and maintains that M.W.'s broken leg was accidental.

> "At the conclusion of the improvement period, the court shall review the performance of the parents in attempting to attain the goals of the improvement period and shall, in the court's discretion, determine whether the conditions of the improvement period have been satisfied and whether sufficient improvement has been made in the context of all the circumstances of the case to justify the return of the child." Syl. Pt. 6, *In re Carlita B.*, 185 W. Va. 613, 408 S.E.2d 365 (1991).

Syl. Pt. 3, *In re J.G.*, 240 W. Va. 194, 809 S.E.2d 453 (2018). Here, although petitioner participated in and completed many terms of his improvement period, he continued to deny any and all wrongdoing, including any domestic violence in the home or that he or the mother caused the nonaccidental injury to M.W. We have held that

> [i]n order to remedy the abuse and/or neglect problem, the problem must first be acknowledged. Failure to acknowledge the existence of the problem, i.e., the truth of the basic allegation pertaining to the alleged abuse and neglect or the perpetrator of said abuse and neglect, results in making the problem untreatable and in making an improvement period an exercise in futility at the child's expense.

*In re Timber M.*, 231 W. Va. 44, 55, 743 S.E.2d 352, 363 (2013) (citation omitted). Petitioner continued to deny the allegations of abuse and neglect despite expert medical testimony that M.W.'s broken leg was the result of nonaccidental injury. Petitioner substantially downplays his actions at the visitation in March of 2021. Not only did M.W.'s caretaker testify that petitioner acted in a dangerous manner, another witness, who had no connection to the parties, testified that while she was working at the reception desk at the DHHR's office, she heard petitioner yell and cuss at the caretaker and saw him try to grab the child from her arms. Additionally, the visitation provider testified that although he did not directly witness the incident, he saw petitioner's anger problems after the visit such as petitioner opening the car door while the vehicle was still in motion and yelling at and grabbing the family dog. The circuit court weighed the credibility of the three witnesses against that of petitioner, who completely denied acting inappropriately, and found petitioner incredible. *Michael D.C. v. Wanda L.C.*, 201 W. Va. 381, 388, 497 S.E.2d 531, 538 (1997) ("A reviewing court cannot assess witness credibility through a record. The trier of fact is

uniquely situated to make such determinations and this Court is not in a position to, and will not, second guess such determinations."). In light of petitioner's concerning and dangerous behaviors and the evidence that the child's leg was likely forcefully pulled or grabbed, the court properly determined that, despite petitioner's compliance with many terms of his improvement period, he had not addressed his anger issues and the child remained in danger. Because of petitioner's continued refusal to accept responsibility for the conditions that led to the filing of the instant petition—conditions that the DHHR worked to address through anger management, domestic violence classes, and parenting education classes—this Court agrees that continuing his improvement period would have been an "exercise in futility at the child's expense." *Id.* Accordingly, we find no error in the circuit court's termination of petitioner's improvement period.

Petitioner also argues that the circuit court erred in terminating his parental rights. He contends that the conditions enumerated in West Virginia Code §§ 49-4-604(d)(1) though (6), which may serve as the basis of a circuit court to find that there was no reasonable likelihood that the conditions of abuse and neglect can be substantially corrected in the near future, were not present in his case. However, petitioner also acknowledges that this list is not exhaustive. Indeed, as discussed above, neither parent took responsibility for the nonaccidental injury to M.W., and this Court has held that

> "[p]arental rights may be terminated where there is clear and convincing evidence that the infant child has suffered extensive physical abuse while in the custody of his or her parents, and there is no reasonable likelihood that the conditions of abuse can be substantially corrected because the perpetrator of the abuse has not been identified and the parents, even in the face of knowledge of the abuse, have taken no action to identify the abuser." Syllabus Point 3, *In re Jeffrey R.L.,* 190 W.Va. 24, 435 S.E.2d 162 (1993).

Syl. Pt. 4, *In re Harley C.,* 203 W. Va. 594, 509 S.E.2d 875 (1998). Here, the record shows that the story surrounding M.W.'s injury was fraught with inconsistences. The mother sometimes said she took the child upstairs to co-sleep and M.W. rolled out of the bed. Another time she stated she was out of the room when the child fell. Another time she stated that although she was asleep, she did not know that petitioner placed the child in bed with her, and she was surprised when she awoke to the baby crying on the floor. Yet another time, petitioner claimed that she, petitioner, and M.W. were all sleeping together, but petitioner went downstairs to sleep on the couch. This differs from later statements that petitioner was always downstairs making dinner. Most importantly, the treating doctor and medical expert testified that the child's inner femur fracture would have been caused by a forceful grabbing or pulling on the leg—not a very short fall from the bed. Further, the doctor testified that M.W. was not yet mobile, thus questioning the child's ability to crawl across a bed and fall. The record establishes that petitioner failed to identify the perpetrator of M.W.'s abuse and, therefore, could not ensure that the abuse would not occur again in the future. Under these circumstances, there was sufficient support for the circuit court's determination that there was no reasonable likelihood that petitioner could correct the conditions of abuse and neglect in the near future, and, therefore, the circuit court did not err in terminating petitioner's parental rights.

For the foregoing reasons, we find no error in the decision of the circuit court, and its August 25, 2021, order is hereby affirmed.

Affirmed.

**ISSUED**: April 14, 2022

**CONCURRED IN BY**:

Chief Justice John A. Hutchison
Justice Elizabeth D. Walker
Justice Tim Armstead
Justice William R. Wooton
Justice Alan D. Moats sitting by temporary assignment