IN THE SUPREME COURT OF APPEALS OF WEST VIRGINIA

January 2018 Term

No. 18-0485

**FILED**

July 6, 2018

**released at 3:00 p.m.**
EDYTHE NASH GAISER, CLERK
SUPREME COURT OF APPEALS
OF WEST VIRGINIA

STATE OF WEST VIRGINIA ex rel. C. H. and S. H.,
Foster Parents of J. L., Jr.,

Petitioners,

v.

THE HONORABLE LAURA V. FAIRCLOTH, Judge
Of the Circuit Court of Berkeley County, West Virginia,
THE WEST VIRGINIA DEPARTMENT OF HEALTH AND HUMAN
RESOURCES, A. M., J. L., AND M. V.,

Respondents.

PETITION FOR WRIT OF PROHIBITION

WRIT GRANTED

Submitted:  June 21, 2018
Filed:  July 6, 2018

Stephanie E. Scales-Sherrin, Esq.
Martinsburg, West Virginia
Attorney for Petitioners C. H. and S. H.


Kimberley Crockett, Esq.
Martinsburg, West Virginia
Attorney for Respondent Mother
A. M.

Patrick Morrisey, Esq.
Attorney General
Melinda C. Dugas, Esq.
Assistant Attorney General
Charleston, West Virginia
Attorney for West Virginia
Department of Health and
Human Resources

Debbie Flowers Payne, Esq.
Martinsburg, West Virginia
Guardian ad Litem for
Respondent Mother A. M.

Nicholas Forrest Colvin, Esq.
Martinsburg, West Virginia
Attorney for Respondent Father
J. L.

Jeffrey K. Matherly, Esq.
Martinsburg, West Virginia
Guardian ad Litem for J. L., Jr.

CHIEF JUSTICE WORKMAN delivered the Opinion of the Court.
JUSTICE LOUGHRY suspended and therefore not participating.

SYLLABUS BY THE COURT

1. "In determining whether to entertain and issue the writ of prohibition for cases not involving an absence of jurisdiction but only where it is claimed that the lower tribunal exceeded its legitimate powers, this Court will examine five factors: (1) whether the party seeking the writ has no other adequate means, such as direct appeal, to obtain the desired relief; (2) whether the petitioner will be damaged or prejudiced in a way that is not correctable on appeal; (3) whether the lower tribunal's order is clearly erroneous as a matter of law; (4) whether the lower tribunal's order is an oft repeated error or manifests persistent disregard for either procedural or substantive law; and (5) whether the lower tribunal's order raises new and important problems or issues of law of first impression. These factors are general guidelines that serve as a useful starting point for determining whether a discretionary writ of prohibition should issue. Although all five factors need not be satisfied, it is clear that the third factor, the existence of clear error as a matter of law, should be given substantial weight." Syl. Pt. 4, *State ex rel. Hoover v. Berger*, 199 W. Va. 12, 483 S.E.2d 12 (1996).

2. "Foster parents who are granted standing to intervene in abuse and neglect proceedings by the circuit court are parties to the action who have the right to appeal adverse circuit court decisions." Syl. Pt. 1, *In re Harley C.*, 203 W. Va. 594, 509 S.E.2d 875 (1998).

3.     "The foster parents' involvement in abuse and neglect proceedings should be separate and distinct from the fact-finding portion of the termination proceeding and should be structured for the purpose of providing the circuit court with all pertinent information regarding the child. The level and type of participation in such cases is left to the sound discretion of the circuit court with due consideration of the length of time the child has been cared for by the foster parents and the relationship that has developed." Syl. Pt. 1, in part, *In re Jonathan G.*, 198 W. Va. 716, 482 S.E.2d 893 (1996).

4.     Foster parents, pre-adoptive parents, or relative caregivers who occupy only their statutory role as individuals entitled to a meaningful opportunity to be heard pursuant to West Virginia Code § 49-4-601(h) (2015) are subject to discretionary limitations on the level and type of participation as determined by the circuit court. Foster parents who have been granted the right to intervene are entitled to all the rights and responsibilities of any other party to the action. To the extent that this holding is inconsistent with *In re Jonathan G.*, 198 W. Va. 716, 482 S.E.2d 893 (1996), our holding in *In re Jonathan G.* is hereby modified.

5.     "Although parents have substantial rights that must be protected, the primary goal in cases involving abuse and neglect, as in all family law matters, must be the health and welfare of the children." Syl. Pt. 3, *In re Katie S.*, 198 W. Va. 79, 479 S.E.2d 589 (1996).

6.     "In a contest involving the custody of an infant the welfare of the child is the polar star by which the discretion of the court will be guided." Syl. Pt. 2, *State ex rel. Lipscomb v. Joplin*, 131 W. Va. 302, 47 S.E.2d 221 (1948).

7.     Foster parents are entitled to intervention as a matter of right when the time limitations contained in West Virginia Code § 49-4-605(b) (2017) and/or West Virginia Code § 49-4-610(9) (2015) are implicated, suggesting that termination of parental rights is imminent and/or statutorily required.

8.     "Child abuse and neglect cases must be recognized as being among the highest priority for the courts' attention. Unjustified procedural delays wreak havoc on a child's development, stability and security." Syl. Pt. 1, in part, *In re Carlita B.*, 185 W. Va. 613, 408 S.E.2d 365 (1991).

WORKMAN, C. J.:

Petitioners/foster parents C. H. and S. H.[1] (hereinafter "foster parents"), seek a writ of prohibition precluding the Circuit Court of Berkeley County from enforcing its March 23, 2018, order denying their motion to intervene and its June 7, 2018, order granting the biological parents A. M. and J. L. (hereinafter collectively "biological parents" and/or "biological mother" and "biological father") post-dispositional improvement periods. The foster parents assert that the circuit court exceeded its legitimate authority by not granting them an evidentiary hearing on their motion to intervene and by granting the biological parents post-dispositional improvement periods in excess of statutory time limitations. The Department of Health and Human Resources (hereinafter "DHHR"), J. L., Jr.'s guardian ad litem, and the biological parents argued below that intervention by the foster parents would have been inappropriate prior to termination of the biological parents' parental rights and that the foster parents have no standing to challenge the post-dispositional improvement periods. Nevertheless, DHHR now maintains that the biological parents' parental rights should be terminated by operation of the statutory time limitations; J. L., Jr.'s guardian ad litem likewise now concurs in that assessment as to biological mother, for her failure to adequately demonstrate improvement.

---

[1] Consistent with our practice in cases involving sensitive facts, we identify the parties by initials only. *See In re Jeffrey R.L.*, 190 W.Va. 24, 26 n.1, 435 S.E.2d 162, 164 n.1 (1993).

1

Upon careful review of the briefs, the appendix record, the arguments of the parties, and the applicable legal authority, we find that the circuit court committed clear error as a matter of law and that the foster parents raise important issues of first impression. We therefore grant the writ of prohibition and remand this case with directions to the circuit court to vacate its order granting the biological parents post-dispositional improvement periods, grant the foster parents' motion to intervene, and to immediately schedule this matter for disposition, conducting any and all further proceedings as necessary and appropriate in this matter in a timely manner.

## I.     FACTS AND PROCEDURAL HISTORY

Respondent biological parents A. M. and J. L. were each named in an abuse and neglect petition shortly after infant J. L., Jr. was born prematurely. The instant petition was based on domestic violence and contentious behavior between the biological parents at the hospital while J. L., Jr. was in the Neonatal Intensive Care Unit (NICU). After approximately eight weeks in the NICU, J. L., Jr. was placed into foster care with the foster parents, where he has remained. He is currently approximately twenty-one months old and continues to suffer from feeding and developmental issues. Biological mother A. M. has prior terminations to three children; biological father J. L. has none. Issues of inadequate

housing as pertained to both biological parents[2] and biological mother A. M.'s low intellectual functioning were later uncovered. The biological mother, who is also hard of hearing, was provided a guardian ad litem as well as counsel, and reasonable accommodation under the Americans with Disabilities Act of 1990, 42 U.S.C. § 12101 *et seq.*, and West Virginia. Code §49-4-604(a)(1) (2016).

Both biological parents admitted to abuse and neglect, whereupon a post-adjudicatory improvement period was ordered for each. None of the orders entered herein are specific about the length of any of the improvement periods, but both biological parents were granted subsequent extensions of their respective improvement periods. They continued on general post-adjudication improvement periods until March 28, 2018, at which point the biological mother had been provided an approximate eleven-month

---

[2] Biological father J. L. resided and continues to reside with his parents throughout these proceedings. He apparently maintained at some point that this residence was inappropriate for J. L., Jr.:

> Q.  You've reported consistently that while living in the home of your parents [J. L., Jr.] couldn't come there but you've had housing this entire time, is that right?
>
> A.  Yes, ma'am.

improvement period and the biological father had been provided a one-year, three-month improvement period.[3]

During their respective improvement periods each biological parent had issues with visitation consistency—the biological father due to transportation issues and the biological mother due to a Virginia-based anonymous DHHR report resulting in termination of her visits in Virginia, where she lived with her father. Both biological parents were eventually compliant with services, but continually struggled to obtain consistent and appropriate housing. During their respective improvement periods, J. L., Jr.'s then-guardian ad litem[4] sought to revoke their improvement periods based on weight loss and illness by J. L., Jr. after visits with biological mother A. M.

In December 2017, the foster parents retained counsel who noticed her appearance; the circuit court ordered her removed from the e-filing system,[5] however,

---

[3] The biological father and biological mother were adjudicated at different times; therefore, their improvement periods began at different times. Both general post-adjudication improvement periods ended with the circuit court's grant of a post-dispositional improvement period on March 28, 2018.

[4] Four guardians ad litem have been assigned to this case during its pendency. The guardian ad litem at the time revocation was sought was Christine Glover, who obtained a new job during the pendency of the case ultimately withdrawing. She was replaced by the current guardian ad litem, Jeffrey Matherly.

[5] Such a removal thereby precluded the foster parents' access to the confidential court file.

given that the foster parents were not parties. Shortly thereafter, the foster parents moved to intervene. A hearing was conducted on the motion to intervene on February 14, 2018, whereupon the circuit court denied the motion. The circuit court found that the intervention was premature since it was still in the "fact-finding," pre-termination stage but that the foster parents would be permitted to participate fully in the MDT meetings and attend hearings.[6] The circuit court found there was nothing more the foster parents could offer as parties than they could in their capacity as participants. The foster parents' counsel did not specifically request to introduce evidence at the time the hearing was conducted; however, the foster parents had previously moved to introduce testimony from their pediatric dietician by telephone. The circuit court denied that motion, finding that telephone testimony inhibited the court's ability to observe the witness' demeanor and was unfair to the biological mother who was intellectually challenged and hard of hearing. Other than this motion, the foster parents did not seek to introduce any other evidence on the record, nor did they object specifically to not being permitted to introduce evidence.[7] J. L., Jr.'s then-guardian ad litem supported the foster parents' intervention.

---

[6] The court stated "[Y]ou have provided and will continue to provide excellent representation for the foster parents. You're welcome to participate in all of the proceedings from MDTs to the court hearings but the Court does agree with the department that at this point to grant intervenor status would be premature[.]" The court further stated that the foster parents were welcome to renew their motion at a later date.

[7] The record reflects that the foster parents' counsel objected simply to the denial of the foster parents' motion to intervene.

Also at this hearing, the circuit court took evidence on the previous request of the guardian ad litem to revoke the biological parents' improvement periods.[8] The then-guardian ad litem's request to revoke the improvement periods was based on the biological mother's lack of care during visits, causing the child to be returned sickly and having lost weight and the biological father's ostensible abandonment of his other child, who was also subject of this proceeding.[9] The circuit court found no reason to revoke the improvement period after hearing the testimony of the biological mother's separately-retained physician who opined that J. L., Jr. was healthy and not medically fragile, as had been suggested. The circuit court further found that any slight weight loss that had occurred was negligible and potentially due to weighing discrepancies and/or recent illness of the child.

The hearing on the motion to revoke was continued to a later date generally for "anything further" on the revocation. It was then *sua sponte* rescheduled for a later

---

[8] While the appendix record reveals no formally filed motion, a report of the then-guardian ad litem requests revocation of the improvement periods.

[9] Despite the fact that the biological father's as-yet-adjudicated abandonment of his older child may well ultimately serve to establish aggravated circumstances obviating the need for the DHHR to use reasonable efforts to reunify with J. L., Jr., the circuit court refused to allow the guardian ad litem to broach issues regarding the older child during the hearing on the biological parents' revocation. *See* W. Va. Code § 49-4-604(7) ("For purposes of the court's consideration of the disposition custody of a child pursuant to this subsection, the department is not required to make reasonable efforts to preserve the family if the court determines: . . . (C) The parental rights of the parent to another child have been terminated involuntarily[.]"). Moreover, the biological father's treatment of the older child—adjudication notwithstanding—is unquestionably a relevant consideration regarding the revocation of his improvement period.

date due to a family emergency of the court. Apparently, the foster parents' counsel provided notice of a scheduling conflict with the new date and was advised by court staff that the court would wait on her arrival at the hearing; however, that apparently did not occur. The hearing was resumed without the foster parents or their counsel being present, nor was their absence noted. During this hearing, which was presumably to be a continuation of the motion to revoke improvement period, the circuit court proceeded to award a six-month post-dispositional improvement period to the biological parents. No objection was made by any parties in attendance, including the new guardian ad litem.[10] As of that date, neither biological parent had independent housing, but the biological father was purportedly being permitted to reside permanently with his parents. The foster parents thereafter filed the instant writ.

## II. STANDARD OF REVIEW

The factors for the issuance of a writ of prohibition are well-established:

> In determining whether to entertain and issue the writ of prohibition for cases not involving an absence of jurisdiction but only where it is claimed that the lower tribunal exceeded

_____

[10] In response to the post-dispositional improvement periods, guardian ad litem Matherly stated

> I have no objection to that. I have slowly been, you know, I was only appointed to substitute as guardian ad litem in this case recently. There's a long history here. A lot of documentation that I have to wade through. . . . So there's still some catching up I need to do but based on everything I know today I have no objections to granting the post-dispositional improvement period and having an MDT so we can discuss it further.

7

its legitimate powers, this Court will examine five factors: (1) whether the party seeking the writ has no other adequate means, such as direct appeal, to obtain the desired relief; (2) whether the petitioner will be damaged or prejudiced in a way that is not correctable on appeal; (3) whether the lower tribunal's order is clearly erroneous as a matter of law; (4) whether the lower tribunal's order is an oft repeated error or manifests persistent disregard for either procedural or substantive law; and (5) whether the lower tribunal's order raises new and important problems or issues of law of first impression. These factors are general guidelines that serve as a useful starting point for determining whether a discretionary writ of prohibition should issue. Although all five factors need not be satisfied, it is clear that the third factor, the existence of clear error as a matter of law, should be given substantial weight.

Syl. Pt. 4, *State ex rel. Hoover v. Berger*, 199 W. Va. 12, 483 S.E.2d 12 (1996). With this standard in mind, we turn to the foster parents' assignments of error.

## III. DISCUSSION

The foster parents make three assignments of error; however, the last two are effectively the same.[11]   First, the foster parents argue that the circuit court erred in denying their motion to intervene without an evidentiary hearing. Secondly, the foster parents argue that the circuit court erred in awarding a post-dispositional improvement period which purportedly violates the time limitations set forth in West Virginia Code § 49-4-601 *et seq*.

---

[11] In their third and final assignment of error, the foster parents argue that "the Department erred" in supporting extension of the improvement periods. Obviously, as characterized, purported "errors" of parties are not redressable on appeal.

8

and lacks sufficient findings to support such an improvement period. We will address each error in turn.

### A. INTERVENTION BY FOSTER PARENTS

As indicated, the foster parents first claim that the circuit court exceeded its legitimate powers by denying their motion to intervene in absence of an evidentiary hearing. Although the foster parents frame this issue procedurally, in terms of the circuit court's failure to hold an evidentiary hearing on their motion to intervene, it is clear from the parties' arguments that the crux of the legal issue presented is the more substantial issue of a foster parent's entitlement to intervene in a pending abuse and neglect proceeding. Although, as examined more fully *infra*, this Court has discussed the proper role of foster parents in abuse and neglect proceedings generally, the Court has not squarely addressed the issue of entitlement to party-intervention of foster parents and when such entitlement, if any, vests.

The biological parents assert that the foster parents are not entitled to a writ of prohibition inasmuch as intervention is a matter of discretion with the circuit court and that the foster parents were nevertheless provided a meaningful opportunity to be heard through their involvement in court proceedings and MDT meetings. More pointedly, the biological father accuses the foster parents of seeking "to act as a surreptitious co-petitioner to work actively against the interests of the Respondent Parents and the appropriate goal of reunification so that they may obtain legal as well as physical custody[.]" In a similar vein,

9

the biological mother insists that granting intervenor status to the foster parents "would only seek to impose more delays, more contention, and more interference and malfeasance into the proceedings." The DHHR likewise contends that foster parents do not have a "right" to party status and that any suggestion that the foster parents were constrained in their ability to advocate for themselves and/or the best interests of J. L., Jr. is disingenuous. These claims require us to review the degree of involvement available to foster parents in abuse and neglect proceedings and the measure of participation thereby afforded.

### 1. Intervention and the Statutory "Right to be Heard"

We must necessarily begin our analysis by reviewing the statutory framework for abuse and neglect proceedings to ascertain whether the Legislature has spoken to the issue of foster parent intervention.[12] West Virginia Code § 49-4-601(h) (2015) provides that

---

[12] We note that the West Virginia Rules of Civil Procedure regarding intervention generally do not apply to abuse and neglect proceedings under Chapter 49 and therefore are not controlling. *See* W.V.R.C.P. 81(a)(7) ("Only rules 5(b), 5(e), and 80 apply in juvenile proceedings."). Nevertheless, the Rule provides useful guidelines for the issue of intervention, generally. Rule 24(a) of the West Virginia Rules of Civil Procedure states:

> Intervention of Right. Upon timely application anyone shall be permitted to intervene in an action: (1) when a statute of this State confers an unconditional right to intervene; or (2) when the applicant claims an interest relating to the property or transaction which is the subject of the action and the applicant is so situated that the disposition of the action may as a practical matter impair or impede the applicant's ability to protect that interest, unless the applicant's interest is adequately represented by existing parties.

> [i]n any proceeding pursuant to this article, the party or parties having custodial or other parental rights or responsibilities to the child shall be afforded a meaningful opportunity to be heard, including the opportunity to testify and to present and cross-examine witnesses. *Foster parents, preadoptive parents, and relative caregivers shall also have a meaningful opportunity to be heard.*

(emphasis added). This statute makes clear two things: 1) that foster parents must be given a "meaningful opportunity to be heard," but 2) that this statutorily-mandated "right to be heard" involves something less than testifying, presenting, and cross-examining witnesses, which are rights provided to "[a] party or parties having custodial or other parental rights or responsibilities[.]" *Id.* These various "tiers" of participation set forth in this statute were recently examined by the Court.

In *State ex rel. H. S. v. Beane*, 2018 WL 2467794 *5 (W. Va. May 30, 2018), this Court found that non-party foster parents who were not informed of or permitted to participate in a parental relative visitation issue were denied their "meaningful opportunity to be heard." Relying primarily on Rule 46 of the Rules of Procedure for Child Abuse and Neglect, the Court found that the foster parents were definitional "persons entitled to notice" and therefore should have been notified of the hearing, which qualified as a "motion for modification" under Rule 46. *Id.* The Court discussed West Virginia Code § 49-4-601(h)'s "two-tiered" format, concluding that non-party foster parents must be given a meaningful opportunity to be heard. Observing that the foster parents were subsequently granted intervenor status, the Court made clear that since they were not *parties* at the time of the hearing, they would not have been permitted to call or question witnesses. *Id.* n.12.

11

*See also Kristopher O. v. Mazzone*, 227 W. Va. 184, 70 S.E.2d 381 (2011) (granting writ of prohibition to non-party foster parents who were excluded from permanency hearing).

What *Beane* properly illustrates is that the right to be heard afforded under West Virginia Code § 49-4-601(h) exists and operates independently of the rights and privileges afforded to intervening parties. Foster parents and others designated in the statute have a right to be heard without the necessity of requesting intervenor status. We find nothing, however, in West Virginia Code § 49-4-601 *et seq.* which *precludes* foster parents from likewise procedurally being granted party-intervenor status where appropriate. Moreover, by noting that the foster parents' right to call or question witnesses was necessarily curtailed by the fact that their motion to intervene was not granted until *after* the hearing on the visitation issue, *Beane* establishes by implication that party-intervenors have greater rights of participation than do parties merely given a statutory "right to be heard." It is, in fact, those greater rights of participation, *i.e.* the ability to call witnesses, have proper notice of court proceedings, and access to the court file, which the foster parents herein specifically sought in moving for intervention.[13]

---

[13] The foster parents purportedly intended to call various service providers and expert witnesses regarding J. L., Jr.'s state of health and special needs during the hearing on the motion to revoke the biological parents' improvement periods. Additionally, upon initially noticing her appearance in the case, the foster parents' counsel was placed in the court's e-filing system, but subsequently ordered to be removed from that system inasmuch as her clients were not parties. Finally, the foster parents bemoan the state of the appendix record submitted in support of their writ as being directly attributable to their lack of access to the official court record as non-parties.

This Court has addressed, at least in part, what participating rights intervening foster parents have in *In re Harley C.*, 203 W. Va. 594, 509 S.E.2d 875 (1998). In *Harley C.*, the biological parents contended that the foster parents, who had been granted intervenor status, had no right to appeal the circuit court's disposition of the abuse and neglect proceedings. *Id.* at 595, 509 S.E.2d at 876. The Court observed that

> [b]y the very definition of intervention the intervenor is a party to the action. After intervention, he or she is as much a party to the action as the original parties, and renders himself vulnerable to complete adjudication of the issues in litigation between himself and the adverse party. To make his rights effectual he must necessarily have the same power as the original parties, subject to the authority of the court reasonably to control the proceedings in the case.

*Id.* at 598, 509 S.E.2d at 879 (quoting 59 Am.Jur.2d *Parties* § 170 (1987)). Accordingly, the Court specifically found that "[intervenors] have all the rights and responsibilities of any other party to the action, including the right to appeal to this Court." *Id.* *Accord A.M. v. A.C.*, 296 P.3d 1026, 1032 (Colo. 2013), *as modified on denial of reh'g* (Mar. 18, 2013) ("[I]ntervention by a foster parent entitles the foster parent to the full panoply of rights that the existing parties enjoy. The designation 'intervenor' signifies how a party came to be involved in a case. By itself, the term does not restrict participation. Generally, courts grant intervenors the same rights as all other parties."). The Court therefore held that "[f]oster parents who are granted standing to intervene in abuse and neglect proceedings by the circuit court are parties to the action who have the right to appeal adverse circuit court decisions." Syl. Pt. 1, *Harley C.*, 203 W. Va. 594, 509 S.E.2d 875.

13

With the understanding that these cases establish that foster parents may occupy either a "right to be heard" participant role or a full party-intervenor role in abuse and neglect proceedings, we turn now to the case that all parties—both the foster parents and the biological parents—claim resolves these issues. The foster parents contend that *In re Jonathan G.*, 198 W. Va. 716, 482 S.E.2d 893 (1996) requires the circuit court to take evidence to consider the foster parents' relationship with the child to determine if intervention is appropriate. The biological parents, however, maintain that *Jonathan G.* makes clear that there is no absolute right to intervention and that the circuit court may restrict, as it sees fit, the level of participation of foster parents under any circumstance. Moreover, the circuit court likewise appeared to rely on the language of *Jonathan G.* to conclude that intervention prior to termination is impermissible on the whole.

In *Jonathan G.*, the circuit court in an abuse and neglect matter granted foster parents "standing in th[e] matter, in order to present another perspective on the best interests of the minor[,]" but cautioned them that "their involvement . . . should not create the false impression that they have parental rights equivalent to [the biological parents], nor coequivalent rights of any sort with regard to [the infant]." *Id*. at 723, 482 S.E.2d at 900. As a result, at the termination hearing, the circuit court permitted their counsel to be present, but did not allow them to present evidence or cross-examine witnesses. *Id*. at 727, 482 S.E.2d at 904.

The *Jonathan G.* Court did not examine the propriety of the "standing" granted to the foster parents nor discuss requirements for party-intervention, but rather focused on the larger issue of the foster parents' "role" in the proceedings. This examination was necessitated by the broad, sweeping language contained in the statute at that time: "In any proceeding pursuant to the provisions of this article, the party or parties having custodial or other parental rights or responsibilities to the child shall be afforded a meaningful opportunity to be heard, including the opportunity to testify and to present and cross-examine witnesses." W. Va. Code § 49-6-2(c) (1996). The Court contrasted this language with the United States Supreme Court's admonition that "'[h]owever substantial the foster parents' interests may be, they are not implicated directly in the factfinding stage of a state-initiated permanent neglect proceeding against the natural parents.'" *Id*. at 729, 482 S.E.2d at 906 (quoting *Santosky v. Kramer*, 455 U.S. 745, 761 (1982)). In an attempt to balance these interests, the Court held:

> The foster parents' involvement in abuse and neglect proceedings should be separate and distinct from the fact-finding portion of the termination proceeding and should be structured for the purpose of providing the circuit court with all pertinent information regarding the child. The level and type of participation in such cases is left to the sound discretion of the circuit court with due consideration of the length of time the child has been cared for by the foster parents and the relationship that has developed.

Syl. Pt. 1, *Jonathan G.*, 198 W. Va. 716, 482 S.E.2d 893. The Court cautioned that "[w]hen foster parents are involved in these proceedings, however, the circuit court must assure that the proceeding does not evolve into a comparison of the relative fitness of the foster parents

15

versus the biological parents." *Id*. at 729, 482 S.E.2d at 906. Scarcely the primer on foster

parent intervention that the parties contend, *Jonathan G*. was, at base, an effort to curtail

the overly-broad syllabus point contained in *Bowens v. Maynard*, 174 W. Va. 184, 324

S.E.2d 145 (1984), which permitted intervention by anyone with physical custody of a

child.[14] In attempting to counter-act the effective "open door" policy created by *Bowens*,

the Court deemed it appropriate to place discretionary limitations on foster parents'

involvement in such proceedings.

        In view of the fact that *Jonathan G*. pre-dates our current statutory right of

foster parents to be heard, it is necessary to clarify the continued vitality and scope of its

holding. As indicated, when *Jonathan G*. was authored, the counterpart to our current

"right to be heard" statute provided that seemingly full participation was afforded to those

with "custodial or other parental rights or responsibilities[.]" W. Va. Code § 49-6-2.

Limitations on that participation were naturally in order, as discussed hereinabove. Those

limitations—the discretionary "level and type of participation" to be determined by the

circuit court discussed in *Jonathan G*.—are still clearly needed when a foster parent or

other statutorily designated individual is participating in a statutory "right to be heard" role.

That role is limited by statute and the precise contours of such involvement must

necessarily be crafted by the circuit court inasmuch as the statute does not specifically

---

[14] *See* Syl. Pt. 1, *Bowens,* 174 W. Va. 184, 324 S.E.2d 145 ("If a party has lawful physical custody of a child, she has the right to . . . be heard in any proceeding that concerns the child.").

delineate the activities permitted. Our precedent makes clear, however, that whatever *evidentiary* limitations are placed on such parties, a meaningful opportunity to be heard includes notice of and the right to be heard on all proceedings insofar as "pertinent information regarding the child" is relevant to the circuit court's consideration. *See* Syl. Pt. 1, *Jonathan G.*, 198 W. Va. 716, 482 S.E.2d 893; *Kristopher O.*, 227 W. Va. 184, 70 S.E.2d 381; *Beane*, 2018 WL 2467794.

However, as indicated above, there is little support for the notion that an intervening party is not entitled to all the participatory rights and privileges of any other named party; in fact, *Harley C.* holds precisely the opposite. Therefore, we modify our holding in *Jonathan G.* as follows: Foster parents, pre-adoptive parents, or relative caregivers who occupy only their statutory role as individuals entitled to a meaningful opportunity to be heard pursuant to West Virginia Code § 49-4-601(h) are subject to discretionary limitations on the level and type of participation as determined by the circuit court. Foster parents who have been granted the right to intervene are entitled to all the rights and responsibilities of any other party to the action.

Turning to the case at bar, it is clear that the foster parents were denied a meaningful opportunity to be heard at the March 28, 2018, hearing wherein the biological parents were granted a post-dispositional improvement period. The foster parents' counsel maintains that she provided a notice of scheduling conflict and was assured by circuit court staff that the hearing would not proceed until she arrived. No party disputes this

17

representation and the hearing transcript plainly reveals that neither she nor the foster parents were present. No party alerted the circuit court to their absence before proceeding. In fact, the hearing transcript reveals that the circuit court had apparently lost any awareness of their involvement or interests at the time of the hearing, despite plainly ruling that they were "welcome" to participate in all court proceedings.[15] This Court finds that the foster parents should not have merely been "welcome" to participate, but were absolutely entitled to participate by virtue of West Virginia Code § 49-4-601(h), irrespective of the circuit court's previous denial of their motion to intervene.

### 2. *Temporal Requirements for Intervention of Right*

While our conclusion that the foster parents were denied their right to be heard through their absence at the March 28, 2018, hearing, we nevertheless find it appropriate to evaluate the basis of the circuit court's denial of their motion to become party-intervenors. In that vein, we must assess the accuracy of the biological parents' contention that *Jonathan G.* sets a temporal limitation on when a foster parent may be permitted intervention. The biological parents maintain that granting intervention prior to termination is *per se* inappropriate by virtue of the Court's holding in *Jonathan G.* and as a practical matter. The biological parents collectively assert that permitting intervention prior to termination would result in a free-for-all contest of parental superiority designed

---

[15] Following the guardian ad litem's recommendation on the post-dispositional improvement period, the circuit court inquired "And where is the child right now?" Guardian ad litem Matherly replied, "Foster care."

to undermine the statutory goals of reunification. The circuit court likewise appeared to rely on *Jonathan G.*'s warning that foster parents' involvement should be "separate and distinct" from the fact-finding portion of the termination proceeding to conclude that since termination had not occurred, intervention was prohibited.

We observe initially that certainly this Court has encountered numerous cases where foster parents were granted intervention before termination occurred. *See, e.g., Jonathan G.*, 198 W. Va. 716, 482 S.E.2d 893 (intervention granted prior to motion to terminate); *In re J. G., II*, 240 W. Va. 194, 809 S.E.2d 453 (2018) (same); *Harley C.* (intervention granted after reunification ordered and petition dismissed). Accordingly, neither the practice of other circuit courts nor this Court's published opinions would vouch for such a reading of *Jonathan G.* [16]

---

[16] In a handful of memo decisions, this Court has upheld the denial of intervention where participation was otherwise permitted. In most instances, however, intervention was sought by aggrieved relatives unlikely to be viable concurrent placements. *See, e.g,, In re A.C.*, No. 12-0726, 2012 WL 5205707, at \*3 (W. Va. Oct. 22, 2012) (circuit court noted concerns regarding placement with foster parents, including lack of bond, instability of home, prior domestic violence allegations); *In re S.S.*, No. 14-1039, 2015 WL 1332668, at \*5 (W. Va. Mar. 16, 2015) (petitioner grandparents found not suitable placement); *In re M.H.*, No. 15-0804, 2016 WL 3449231, at \*3 (W. Va. June 16, 2016) (DHHR instituted actions against petitioner due to allegations of child sexual abuse, drug abuse, and failure to protect child). *But see In re A.M.,* No. 14-0698, 2014 WL 6635067, at \*3 (W. Va. Nov. 24, 2014) (upholding denial of intervention where parents wished to argue court granted "too much deference" in completing improvement periods and provide evidence of effect of parents' drug abuse on children); *State ex rel. R.H. v. Bloom*, No. 17-0002, 2017 WL 1788946, at \*5 (W. Va. May 5, 2017) (upholding denial of intervention where petitioner permitted to testify at adjudicatory hearing, lawyer was permitted to monitor remainder of hearing, and petitioner personally participated in MDT meeting).

Moreover, it is clear that such a construction of *Jonathan G.* reads far too much into its holding. As indicated, the analysis contained in *Jonathan G.* does not specifically address the propriety or timing of intervention, nor does syllabus point one purport to do so. Our holding states merely that foster parents' "*involvement*" should be distinct from "the *fact-finding portion* of the termination proceeding." (emphasis added). Plainly read, and in context with its further admonition that the Court resist any urge to compare the relative fitness of the parties, this syllabus point simply directs the Court to give foster parents' contributions only their due consideration as pertains to information regarding the child(ren), rather than the relative fitness of their biological parent(s).

Importantly, *Jonathan G.* must also be placed into its proper historical context. It is critically important to note the changes that our abuse and neglect laws have undergone, particularly as pertains to the goal of reunification and the importance of the role of concurrent planning for permanency. *See* West Virginia Code § 49-4-604(a)(2) (2016). Certainly the over-arching purpose of our abuse and neglect statutory construct continues to be the correction of conditions of abuse and neglect and the return, if reasonably possible, of the children to their homes. However, reunification is no longer viewed as an "at all costs" goal. Instead, the Court has recognized that the aim of reunification does not require the courts to test the boundaries of opportunity provided to parents during improvement periods. Our more recent caselaw over the past ten to fifteen years regarding improvement periods illustrates the point.

20

This Court has endeavored to curtail perpetual improvement periods based upon only minimal improvement by holding that "'courts are not required to exhaust every speculative possibility of parental improvement before terminating parental rights where it appears that the welfare of the child will be seriously threatened. . . .'" Syl. Pt. 7, in part, *In re Carlita B*., 185 W.Va. 613, 408 S.E.2d 365 (1991) (quoting Syl. Pt. 1, *In re R. J. M.*, 164 W.Va. 496, 266 S.E.2d 114 (1980)); *see also In re Isaiah A*., 228 W. Va. 176, 185, 718 S.E.2d 775, 784 (2010) (finding "glimmer of hope" standard inconsistent with criteria expressly provided by statute). We have more explicitly required that parental rights to improvement periods must give way to the bests interests of the child by holding that "[i]n making the final disposition in a child abuse and neglect proceeding, the level of a parent's compliance with the terms and conditions of an improvement period is just one factor to be considered. The controlling standard that governs any dispositional decision remains the best interests of the child." Syl. Pt. 4, *In re B. H.*, 233 W. Va. 57, 754 S.E.2d 743 (2014). These cases illustrate a more recent recognition that *only* when reunification fully serves the best interests of the child do statutorily required efforts to reunite the family dovetail with the goal of abuse and neglect proceedings.

In terms of the more recent appreciation of the significant stake foster parents have in these proceedings, one need look no further than the subsequent addition of "foster parents, preadoptive parents, and relative caregivers" to West Virginia Code § 49-4-601(h) as those who must be given a meaningful opportunity to be heard in these matters. Foster parents are also statutorily-mandated members of the multidisciplinary team and

21

statutorily-defined "person[s] entitled to notice and the right to be heard," regarding modifications of dispositional orders, receipt of permanency planning reports, and permanency hearings.[17] These statutory provisions reflect a Legislative recognition that foster parents, pre-adoptive parents and/or relative caregivers should occupy a specially designated posture in abuse and neglect proceedings that affords them involvement commensurate with their commitment to the process and the child. *See also A.M.*, 296 P.3d at 1037 (identifying similar statutory provisions involving foster parents and recognizing them as crucial to "government's interest to maintain a fair proceeding and protect the long-term welfare of children").

In that regard, the development of concurrent planning requirements has dramatically sharpened the interest foster parents have in the post-adjudicatory process. West Virginia Code § 49-4-604(a)(2) requires concurrent permanent placement planning with specific timelines "for when the placement is expected to become a permanent placement." Indeed, this Court has expressly held that "[c]oncurrent planning, wherein a permanent placement plan for the child(ren) in the event reunification with the family is unsuccessful is developed contemporaneously with reunification efforts, is in the best interests of children in abuse and neglect proceedings." Syl. Pt. 5, *In re Billy Joe M.*, 206 W. Va. 1, 521 S.E.2d 173 (1999); *see also In Interest of Micah Alyn R.*, 202 W. Va. 400, 409, 504 S.E.2d 635, 644 (1998) (Workman, J., concurring) ("[C]oncurrent planning for

---

[17] *See* W. Va. Code §§ 49-4-405(b)(3), 606(a), and 49-4-608(b) (2015), respectively.

22

permanency should occur even where parental rights are not terminated. This should be the practice in all abuse and neglect cases, so that there is a permanency plan for children where family reconciliation efforts are not successful for whatever reason.").

Concurrent planning, therefore,—where foster parents are anticipated to be the alternate permanent placement—naturally heightens the vested interest foster parents have in these proceedings. It is the goal of this planning to ensure that the concurrent placement is ready, willing, and able to proceed to permanency with the subject child if and when termination occurs. What being a concurrent placement requires of foster parents then is that they commit themselves fully to the anticipatory permanent physical and legal custody of the child and be appropriately bonded with and invested in the well-being of the child. Naturally, this results in attachment and a desire to maintain a loving bond and involvement in the child's life, even with an understanding that the child could be reunified with one or more parents. We should expect and desire nothing less of people who may ultimately share their lives, homes, and families with an abused or neglected child.

This vested interest naturally spikes when termination appears imminent, or more importantly, is statutorily mandated. To that end, the foster parents assert that their intervention became "ripe" when the DHHR was statutorily required to seek termination. West Virginia Code § 49-4-605 (2017) provides that

> the department shall file or join in a petition or otherwise seek
> a ruling in any pending proceeding to terminate parental rights
> . . . . [i]f a child has been in foster care for fifteen of the most

recent twenty-two months as determined by the earlier of the date of the first judicial finding that the child is subjected to abuse or neglect or the date which is sixty days after the child is removed from the home[.]

The only exceptions to this requirement are if the child has been permanently placed with a relative, a "compelling reason," or the DHHR "has not provided, when reasonable efforts to return a child to the family are required, the services to the child's family as the department deems necessary for the safe return of the child to the home." W. Va. Code § 49-4-605(b). DHHR has established none of those exceptions and appears to concede the foster parents' position on this point inasmuch as it has now represented to the Court that it must move for termination at this point in the proceedings.[18]

The foster parents further cite to West Virginia Code § 49-4-610(9) (2015) as necessitating termination, thereby giving rise to their entitlement to intervene. West Virginia Code § 49-4-610(9) states:

> Notwithstanding any other provision of this section, no combination of any improvement periods or extensions thereto *may cause a child to be in foster care more than fifteen months of the most recent twenty-two months*, unless the court finds compelling circumstances by clear and convincing evidence that it is in the child's best interests to extend the time limits contained in this paragraph.

(emphasis added). J. L., Jr. was in foster care fifteen of the most recent twenty-two months as of January 18, 2018, yet the circuit court made no finding of compelling circumstances

---

[18] In fact, this would appear to have been required of the DHHR at the time that it agreed to a post-dispositional improvement period as well, given that J. L., Jr. had been in foster care fifteen of the most recent twenty-two months prior to that hearing.

24

to justify the continual improvement periods. J. L., Jr. has now been in the foster parents' care twenty of his twenty-one months of life.

Consistent with our preeminent principle that "the primary goal in cases involving abuse and neglect . . . must be the health and welfare of the children" and that "the welfare of the child is the polar star by which the discretion of the court will be guided," we find that the intervention of foster parents when termination is imminent or required furthers these goals. Syl. Pt. 3, in part, *In re Katie S.*, 198 W. Va. 79, 479 S.E.2d 589 (1996); Syl. Pt. 2, in part, *State ex rel. Lipscomb v. Joplin*, 131 W. Va. 302, 47 S.E.2d 221 (1948). We observe that intervention of right prior to adjudication or early on in a post-adjudicatory time period has little utility given the underdeveloped nature of the proceedings and the need to permit the statutory process to proceed as intended. However, at such time as termination appears imminent due to lapse of statutory improvement period time frames or other factors requiring the DHHR to seek termination, it is in the interests of all parties that the foster parents be recognized as occupying a critically important position relative to the child and that such position be dignified with full intervenor status if sought.[19]

---

[19] As previously indicated, although the Rules of Civil Procedure do not apply to these proceedings, we find instructive this Court's holding on the "interest" required to substantiate intervention of right. The Court has held that

We find this triggering time frame of imminent termination consistent with the point in time when foster parents attain "a statutorily recognized expectancy in a continued relationship between themselves and their foster children[.]" *In re Dependency of J.H.*, 815 P.2d 1380, 1388 (Wash. 1991). We note further the practical necessity of permitting foster parents to intervene to compel compliance with statutory time frames where neither the DHHR nor guardian ad litem have done so.[20] This is an issue this Court has repeatedly encountered; invariably it is the foster parents who seek to bring the matter before the Court. *See, e.g.*, *J. G., II,* 240 W. Va. 194, 809 S.E.2d 453 (foster parents appealed where circuit court failed to make findings, disregarded lack of substantial improvement, and time limitations on improvement periods). The reason for this is

---

> [t]o justify intervention of right under West Virginia Rule of Civil Procedure 24(a)(2), the interest claimed by the proposed intervenor must be direct and substantial. A direct interest is one of such immediate character that the intervenor will either gain or lose by the direct legal operation and effect of the judgment to be rendered between the original parties. A substantial interest is one that is capable of definition, protectable under some law, and specific to the intervenor. In determining the adequacy of the interest in a motion to intervene of right, courts should also give due regard to the efficient conduct of the litigation.

Syl. Pt. 4, *State ex rel. Ball v. Cummings*, 208 W. Va. 393, 540 S.E.2d 917 (1999). We find that these considerations are amply fulfilled as pertains to concurrent placement foster parents when termination of parental rights appears imminent.

[20] *See* Syl. Pt. 2, *State ex rel. Amy M. v. Kaufman*, 196 W. Va. 251, 470 S.E.2d 205 (1996) ("Prohibition is available to abused and/or neglected children to restrain courts from granting improvement periods of a greater extent and duration than permitted under West Virginia Code §§ 49-6-2(b) and 49-6-5(c) (1995).").

obvious—at the point in time when the DHHR must by statute seek termination and/or the circuit court has permitted the matter to linger past the Legislatively-determined outer limit of "fifteen of the most recent twenty-two months," the foster parents have an undeniable interest and expectancy in the permanency aspect of the proceeding.

Accordingly, we hold that foster parents are entitled to intervention as a matter of right when the time limitations contained in West Virginia Code §49-4-605(b) and/or West Virginia Code § 49-4-610(9) are implicated, suggesting that termination of parental rights is imminent and/or statutorily required. We hold little concern that this intervention will inject an additional adversarial component to the proceedings, cause unnecessary delay, or prompt the circuit court to conflate the goals of abuse and neglect proceedings with selecting a superior caregiver. As the Supreme Court of Colorado observed,

> the presentation of evidence by any party is limited by familiar principles of evidence. The prohibition on irrelevant or needlessly cumulative evidence should ameliorate the potentially significant increase in the volume of information at the termination hearing. Juvenile courts act as gatekeepers so that, in cases where additional parties have intervened, the termination hearing ought not become awash with unnecessary evidence or devolve into a contested custody hearing.

*A.M.*, 296 P.3d at 1034 (citation omitted). The *A. M.* Court wisely observed that precluding intervention prior to termination may

> actually serve to diminish the accuracy of decisions by withholding admissible, highly relevant information from a juvenile court's consideration merely because it comes from a foster parent. Exclusion of relevant information that foster

27

parent intervenors might provide would therefore heighten, not mitigate, the risk of an erroneous decision at the termination hearing.

*Id*. at 1037. The Court is confident that our lower courts can properly utilize the vitally important information regarding the child held exclusively by foster parents for its intended purpose rather than a means to deprive the biological parents of the protections of the abuse and neglect process.

Despite our extension of the right of intervention to foster parents when termination is imminent or required, we strongly caution that this right bestows no additional entitlements or procedural or substantive rights to foster parents above those granted by statute. As well-stated by the Supreme Court of Nebraska regarding its grandparent intervention statute,

> [a]lthough grandparents have a right to intervene in dependency proceedings involving their minor grandchildren prior to final disposition, this right "does not confer any special entitlements or priorities upon them with respect to temporary custody, placement, or any other issue before the juvenile court." Rather, "[e]xercising their right of intervention simply enables those grandparents wanting to keep abreast of dependency proceedings to receive notice and have an opportunity to be heard with respect to actions taken by a juvenile court which could significantly affect their relationship with their grandchildren."

*In re Interest of Jackson E.*, 875 N.W.2d 863, 866-67 (Neb. 2016) (quoting *In re Interest of Kayle C.*, 574 N.W.2d 473, 478 (Neb. 1998)). Furthermore, our holding today in no way undermines our conviction that it is in a child's best interests to be unified with his or her natural family if reasonably possible and that foster parents serve a vital role in fulfilling

28

that specific goal. *See In re G.C.*, 735 A.2d 1226, 1229 (Pa. 1999) (citations omitted) ("[I]f possible, a child should grow up with its parents. . . . It is the foster parents' responsibility to help to achieve these purposes—not to subvert them."). However, at the point in time when termination is imminent or required, those goals have plainly already given way to the paramount necessity of attaining permanency for the child in a home environment which serves his or her best interests. Where foster parents are designated as a concurrent permanent placement, there is little question that their interests in the proceedings evolve in a decidedly more substantial way, just as our concurrent planning system contemplates.

Turning now to the foster parents' requested writ of prohibition, we find that this case presents "new and important problems or issues of law of first impression," sufficient to satisfy the standard for issuance of a writ. Syl. Pt. 4, in part, *Hoover*, 199 W. Va. 12, 483 S.E.2d 12. As indicated above, we easily conclude that the foster parents were denied a meaningful opportunity to be heard as required by West Virginia Code § 49-4-601(h) insofar as the biological parents were granted post-dispositional improvement periods without the foster parents' presence or participation at the hearing. We further find, however, that the foster parents are entitled to intervene as parties to the action inasmuch as J. L., Jr. has been in their care for fifteen of the most recent twenty-two months and the time frames requiring the DHHR's efforts to seek termination are squarely implicated. We therefore grant the writ of prohibition to require the circuit court to vacate its order granting the biological parents post-dispositional improvement periods and grant the foster parents' motion to intervene.

29

B.  EXCEEDING IMPROVEMENT PERIOD TIME STANDARDS

In their final assignment of error, the foster parents attack directly the circuit court's award of a post-dispositional improvement period, which they assert is in excess of statutory limitations.  The biological parents contend that the foster parents simply have no standing to attack a disposition as non-party foster parents.[21]  However, as a practical matter, our resolution hereinabove vacates the biological parents' post-dispositional improvement periods, thereby requiring the circuit court to revisit the disposition of this matter.  Our requirement that the foster parents be granted intervenor status therefore permits them to assert their objections to the award of any further improvement periods directly to the circuit court.

We remind the circuit court and the parties, however, that "[i]mprovement periods are [] regulated, both in their allowance and in their duration, by the West Virginia Legislature, which has assumed the responsibility of implementing guidelines for child

---

[21] While we decline to address the standing issue raised by the biological parents, as pertains to our holding regarding intervention, we note that "a majority of courts argue that the interest required for intervention is not as weighty as the interest required for standing[.]"  Elizabeth Zwickert Timmermans, *Has the Bowsher Doctrine Solved the Debate?: The Relationship Between Standing and Intervention As of Right*, 84 Notre Dame L. Rev. 1411, 1412 (2009).  *Cf.* W. Va. Code § 48-9-103(b) (2001) (authorizing court's discretion to "grant permission to intervene to other persons or public agencies whose participation in [child custody] proceedings . . . it determines is likely to serve the child's best interests[,]" but stating "[s]uch persons or public agencies do not have standing to initiate an action under this article.").

abuse and neglect proceedings generally." *In re Emily*, 208 W. Va. 325, 334, 540 S.E.2d

542, 551 (2000).  More importantly and as well-illustrated in this case,

> the early, most formative years of a child's life are crucial to his or her development. There would be no adequate remedy at law for these children were they permitted to continue in this abyss of uncertainty. We have repeatedly emphasized that children have a right to resolution of their life situations, to a basic level of nurturance, protection, and security, and to a permanent placement. *The legislature has recognized this by limiting the extent and duration of improvement periods a court may grant in an abuse and neglect case.*

*Amy M.,* 196 W. Va. at 257-58, 470 S.E.2d at 211-12 (emphasis added).  Further, it is

necessary to reiterate the self-evident instruction the Court articulated earlier in this Court

term:

> The procedural and substantive requirements of West Virginia Code § 49-4-601 *et seq.,* the Rules of Procedure for Child Abuse and Neglect, and our extensive body of caselaw are not mere guidelines. The requirements contained therein are not simply window dressing for orders which substantively fail to reach the issues and detail the findings and conclusions necessary to substantiate a court's actions. The time limitations and standards contained therein are mandatory and may not be casually disregarded or enlarged without detailed findings demonstrating exercise of clear-cut statutory authority. Discretion granted to the circuit court within this framework is intended to allow the court to fashion appropriate measures and remedies to highly complex familial and inter-personal issues—it does not serve as a blanket of immunity for the circuit court to manage abuse and neglect cases as its whim, personal desire, or docket may fancy.

*J. G., II,* 240 W. Va. at ___, 809 S.E.2d at 463.

31

Finally, we take note of the parties' representations during oral argument that the circuit court has scheduled a dispositional hearing for September 2018. We find this delay wholly unacceptable and observe that, upon our review of the supplemental hearing transcript, the delay is occasioned by the competing calendars of the court and counsel. We remind both the circuit court and the parties that "[c]hild abuse and neglect cases must be recognized as being among the highest priority for the courts' attention. Unjustified procedural delays wreak havoc on a child's development, stability and security." Syl. Pt. 1, in part, *Carlita B.*, 185 W.Va. 613, 408 S.E.2d 365. Accordingly, upon issuance of the writ, the circuit court is directed to schedule this matter for disposition at its earliest opportunity and direct counsel that they are to manage their schedules in a manner which facilitates this immediate scheduling.

## IV. CONCLUSION

Accordingly, for the reasons stated herein, the Court grants the requested writ of prohibition. The Clerk is hereby directed to issue the mandate contemporaneously herewith.

Writ granted.

32