**STATE OF WEST VIRGINIA**
**SUPREME COURT OF APPEALS**

*In re* **N.S., D.S., A.S., and J.S.**

**No. 21-1003** (Barbour County 19-JA-117, 19-JA-118, 19-JA-119, and 19-JA-120)

## MEMORANDUM DECISION

Petitioners C.B. and J.B., by counsel Steven B. Nanners, appeal the Circuit Court of Barbour County's November 18, 2021, order denying their motion to intervene in the proceedings and for permanent placement of N.S., D.S., A.S., and J.S.[1] The West Virginia Department of Health and Human Resources ("DHHR"), by counsel Patrick Morrisey and Katica Ribel, filed a response in support of the circuit court's order. The guardian ad litem ("guardian"), Allison C. Iapalucci, filed a response on the children's behalf in support of the circuit court's order. On appeal, petitioners argue that the circuit court erred in denying their motion to intervene and for permanent placement of the children.

This Court has considered the parties' briefs and the record on appeal. The facts and legal arguments are adequately presented, and the decisional process would not be significantly aided by oral argument. Upon consideration of the standard of review, the briefs, and the record presented, the Court finds no substantial question of law and no prejudicial error. For these reasons, a memorandum decision affirming the circuit court's order is appropriate under Rule 21 of the Rules of Appellate Procedure.

In September of 2019, the DHHR filed a child abuse and neglect petition alleging that the children's parents failed to supply the children with a suitable home and exposed the children to domestic violence. Upon the filing of the petition, the DHHR placed the children with petitioners, who are the children's maternal grandparents, and the children remained in this placement throughout the abuse and neglect proceedings. The parents were granted improvement periods but ultimately failed to remedy the conditions of abuse and neglect. The circuit court

---

[1]Consistent with our long-standing practice in cases with sensitive facts, we use initials where necessary to protect the identities of those involved in this case. *See In re K.H.*, 235 W. Va. 254, 773 S.E.2d 20 (2015); *Melinda H. v. William R. II*, 230 W. Va. 731, 742 S.E.2d 419 (2013); *State v. Brandon B.*, 218 W. Va. 324, 624 S.E.2d 761 (2005); *State v. Edward Charles L.*, 183 W. Va. 641, 398 S.E.2d 123 (1990).

1

involuntarily terminated the parents' parental rights to the children in April of 2021. The circuit court ordered no contact between the children and their parents, and petitioners were informed of that order. At the time of the dispositional hearing, the children had been in petitioners' care for over eighteen months.

Subsequent to the dispositional hearing, the DHHR received a referral that the biological parents continued to have contact with the children in violation of the circuit court's order, that the mother was living on petitioners' property, and that the children were living in deplorable conditions while in petitioners' care. The DHHR investigated the allegations and substantiated them, which led to the removal of the children from petitioners' custody on May 24, 2021.[2]

On June 24, 2021, petitioners filed a motion to intervene in the proceedings and for the return of the children to their custody. In their motion, they denied any wrongdoing and alleged that the DHHR erroneously removed the children from their care.[3]

---

[2]For clarification, the children had not achieved permanency with petitioners prior to their removal from this home.

[3]Notably, West Virginia Code § 49-4-111(a) governs the removal of children from a foster care placement and provides that

> [t]he department may temporarily remove a child from a foster home based on an allegation of abuse or neglect, including sexual abuse, that occurred while the child resided in the home. If the department determines that reasonable cause exists to support the allegation, the department shall remove all foster children from the arrangement, preclude contact between the children and the foster parents, provide written notice to the multidisciplinary treatment team members and schedule an emergency team meeting to address placement options. If, after investigation, the allegation is determined to be true by the department or after a judicial proceeding a court finds the allegation to be true or if the foster parents fail to contest the allegation in writing within twenty calendar days of receiving written notice of the allegations, the department shall permanently terminate all foster care arrangements with the foster parents.

The DHHR properly terminated petitioners' foster care arrangement upon substantiating abuse or neglect of the children in petitioners' home. Following an investigation, the DHHR substantiated the allegations that petitioners failed to provide the children with a suitable home and allowed the mother to have continued contact with the children after the termination of her parental rights. Furthermore, the duration of petitioners' custody of the children is inconsequential to this analysis. West Virginia Code § 49-4-111(b) provides that a foster care placement in excess of eighteen months may only be terminated if termination is in the best interest of the child and if termination is in accordance with West Virginia Code § 49-4-111(a), among other circumstances warranting termination of the foster care arrangement.

During the hearing on petitioners' motion, the DHHR's internal investigation unit report ("IIU report") was admitted as evidence. According to the IIU report, the mother and father continued to reside in the same neighborhood as the children after the termination of their parental rights. On May 9, 2021, the parents were involved in a domestic violence altercation outside of petitioners' residence, and the mother drove over the father with her vehicle. The children were home at the time and aware of the incident, although they were ordered by petitioners to stay inside while Petitioner J.B. attended the scene. Then, on May 24, 2021, the mother was found hiding in petitioners' camper on their property during a DHHR investigation. The children indicated that Petitioner C.B. told them that they could see the mother after the children were adopted. However, until then, the children were reportedly required to leave the room when the mother visited the home.

The DHHR also reported that the children stated they were "not allowed to talk about things that happened at grandma's [petitioners'] home. . . . [t]hey are not allowed to talk about the bed bugs, their parents fighting, they are not allowed to talk about anything." Nevertheless, the children disclosed that J.S. and D.S. bathe together and A.S. and N.S. bathe after them, using the same bath water. Eleven-year-old N.S. was "allowed to add clean water, only to wash her hair." The children were observed with "dirty hands and face[s]" at their school with clothes that did not fit and shoes with holes in them.

Finally, the DHHR reported that petitioners' home was in a deplorable state. Outside of the home, the investigator observed dangerous objects, such as boards with nails protruding outward and sharp metal pieces in the grass. Inside the home were "massive amounts of clutter, debris, food, unsecured medications, [and] sharp objects." The children's rooms were "completely covered in clothing, objects, and loose bedding" and their beds had no sheets. The report also noted that "[a]ll counter and table areas were covered in household clutter and debris." Ultimately, the DHHR concluded that the children were neglected in petitioners' care and terminated the foster care arrangement.

At the hearing, the circuit court heard from the guardian regarding her investigation into the allegations, along with testimony from both petitioners and a DHHR worker. The guardian stated that she met with the children at their school, and the children disclosed that they had contact with their mother with petitioners' knowledge and consent. The guardian also agreed with the DHHR's assessment that the home was in deplorable condition. The guardian met with the children after they had been placed in a new foster home, and the children "specifically asked not to be removed" from that home. She stated that N.S. was the only child who expressed a desire for continued contact with Petitioner C.B. "but only so long as she [was] permitted to reside with the [new foster] family."

Petitioners both denied that the mother was staying in the camper on their property. Petitioner C.B. testified that she discovered the mother in the camper early in the morning on the day that the DHHR came to investigate. She testified that she told the mother to leave, the mother refused, and she took no further action. Petitioner C.B. asserted that the mother had no contact with the children, and if the children stated otherwise, they were lying. Both petitioners also testified that they believed the children became dirty at school, rather than as a result of neglectful care.

The DHHR worker testified that, when the children were removed from petitioners' care, the children had to be "cleaned and re-clothed" with emergency clothing kept at the DHHR office. She also believed that the dirt apparent on the children was not consistent with dirt accumulation from a day at school. According to the DHHR worker, she always notified petitioners when she would inspect their home. She explained that the household was always dirty; she discussed clothing with petitioners during each visit, but those conditions never improved.

Following the presentation of evidence, petitioners and counsel were excused from the courtroom. The court weighed petitioners' testimony against the proffer of the guardian and the DHHR's IIU report and concluded that petitioners were not being truthful. The circuit court noted that it could not understand why the children would fabricate contact with their mother and found that petitioners were aware that the children were not permitted contact with their parents. The court found that petitioners' home was in "the same condition[]" it was when the children were removed from their parents. The court held its ruling in abeyance, waiting to hear testimony from the author of the DHHR's IIU report. Following the receipt of an affidavit from the author of the DHHR's IIU report, affirming the veracity of the original report, the circuit court denied petitioners' motion to intervene and for permanent placement of the children in their care. The circuit court's November 18, 2021, order memorialized its decision. Petitioners now appeal this order.[4]

The Court has previously held:

> "Although conclusions of law reached by a circuit court are subject to *de novo* review, when an action, such as an abuse and neglect case, is tried upon the facts without a jury, the circuit court shall make a determination based upon the evidence and shall make findings of fact and conclusions of law as to whether such child is abused or neglected. These findings shall not be set aside by a reviewing court unless clearly erroneous. A finding is clearly erroneous when, although there is evidence to support the finding, the reviewing court on the entire evidence is left with the definite and firm conviction that a mistake has been committed. However, a reviewing court may not overturn a finding simply because it would have decided the case differently, and it must affirm a finding if the circuit court's account of the evidence is plausible in light of the record viewed in its entirety." Syl. Pt. 1, *In Interest of Tiffany Marie S.*, 196 W.Va. 223, 470 S.E.2d 177 (1996).

Syl. Pt. 1, *In re Cecil T.*, 228 W. Va. 89, 717 S.E.2d 873 (2011).

---

[4]As previously mentioned, the children's parents' parental rights were terminated below. The permanency plan for the children is adoption in their current foster placement.

On appeal, petitioners argue that the circuit court erred in denying their motion to intervene and for permanent placement of the children. In support of intervention, petitioners stress that the children had been in their care from September of 2019 until May of 2021, in excess of eighteen months. They argue that the circuit court did not provide them a meaningful opportunity to be heard, pursuant to West Virginia Code § 49-4-601(h), because they were not permitted to cross-examine the author of the DHHR's IIU report and were not granted access to the confidential court file prior to the evidentiary hearing for permanent placement. Petitioners further argue that the circuit court erred in its application of West Virginia Code § 49-4-114, also known as the "grandparent preference" for adoption in child abuse and neglect cases. Upon our review, petitioners are entitled to no relief on appeal.

West Virginia Code § 49-4-601(h) provides

> In any proceeding pursuant to this article, the party or parties having custodial or other parental rights or responsibilities to the child shall be afforded a meaningful opportunity to be heard, including the opportunity to testify and to present and cross-examine witnesses. Foster parents, pre-adoptive parents, and relative caregivers shall also have a meaningful opportunity to be heard.

We have recognized that this code section establishes a "two-tiered framework" between "[p]arties having 'custodial or other parental rights or responsibilities to the child'" and "[f]oster parents, preadoptive parents, and relative caregivers." *State ex rel. H.S. v. Beane*, 240 W. Va. 643, 647, 814 S.E.2d 660, 664 (2018). Critical to the facts of this case, "[a] person 'who obtains physical custody *after* the initiation of abuse and neglect proceedings – such as a foster parent – does not enjoy the same statutory right of participation as is extended to parents and pre-petition custodians.'" *Id*, at 648, 814 S.E.2d at 665 (citation omitted).

Here, petitioners obtained physical custody of the children after the initiation of the proceedings. Therefore, petitioners were not entitled to the same level of participation as a parent. Nor were they entitled to present evidence or cross-examine witnesses.

> Foster parents, pre-adoptive parents, or relative caregivers who occupy only their statutory role as individuals entitled to a meaningful opportunity to be heard pursuant to West Virginia Code § 49-4-601(h) . . . are subject to discretionary limitations on the level and type of participation as determined by the circuit court.

Syl. Pt. 4, in part, *State ex rel. C. H. v. Faircloth*, 240 W. Va. 729, 815 S.E.2d 540 (2018). It is clear that the circuit court provided petitioners a meaningful opportunity to be heard as to the best interests of the children and they were permitted to present testimony in support of the children's permanent placement in their care. In sum, West Virginia Code § 49-4-601(h) does not entitle petitioners to a greater level of participation than what the circuit court afforded them below.

Moreover, the circuit court did not err in denying petitioners' motion to intervene despite the length of time the children were in petitioners' care. Petitioners' argument in this regard

focuses on the eighteen months that they cared for the children during the proceedings. Although petitioners do not cite any authority to explain the significance of the period of time that the children were in their care to their motion to intervene, this argument appears to implicitly rely upon syllabus point seven of *Faircloth*, which provides

> [f]oster parents are entitled to intervention as a matter of right when the time limitations contained in West Virginia Code § 49-4-605(b) . . . and/or West Virginia Code § 49-4-610(9) . . . are implicated, suggesting that termination of parental rights is imminent and/or statutorily required.

240 W. Va. at 732-33, 815 S.E.2d at 543-44. The time limitation referenced in West Virginia Code §§ 49-4-605(b) and 49-5-610(9) is "fifteen of the most recent twenty-two months," which, as we recognized in *Faircloth*, is a "triggering time frame of imminent termination" of parental rights. *Id.*, 240 W. Va. at 743, 815 S.E.2d at 554. However, as mentioned above, petitioners were *not* foster parents of the children at the time that they moved to intervene, and, furthermore, termination of the parental rights of the parents was not imminent, as it had already occurred. Therefore, petitioners were not entitled to intervention as a matter of right as they asserted below and now on appeal.

Finally, we consider whether the circuit court erred in its application of West Virginia Code § 49-4-114(a)(3), the grandparent preference.[5] "[West Virginia Code § 49-4-114(a)(3)] contemplates that placement with grandparents is presumptively in the best interests of the child, and the preference for grandparent placement may be overcome only where the record reviewed in its entirety establishes that such placement is not in the best interests of the child[ren]." Syl. Pt. 7, in part, *In re P.F.*, 243 W. Va. 569, 848 S.E.2d 826 (2020) (internal citation omitted). As we have held, the "grandparent preference" is not absolute and placement must "be in the best interests of the child[ren], given all circumstances of the case." *Id*, at 571, 848 S.E.2d at 827, syl. pt. 8, in part. Therefore, in order to deny petitioners permanent placement of the children, the circuit court must have concluded that placement outside of that home was in their best interests.

---

[5]For purposes of any placement of a child for adoption by the department, the department shall first consider the suitability and willingness of any known grandparent or grandparents to adopt the child. Once grandparents who are interested in adopting the child have been identified, the department shall conduct a home study evaluation, including home visits and individual interviews by a licensed social worker. If the department determines, based on the home study evaluation, that the grandparents would be suitable adoptive parents, it shall assure that the grandparents are offered the placement of the child prior to the consideration of any other prospective adoptive parents.

W. Va. Code § 49-4-114(a)(3).

Here, the circuit court was presented evidence that the children were subjected to deplorable living conditions while in petitioners' home, akin to the conditions that they suffered in the home of their biological parents. The children were observed to be excessively dirty with ill-fitting clothing and were suffering from a bed bug infestation in their rooms. Moreover, the DHHR worker testified that she noted these concerns during prior announced visits to the home and raised the concerns with petitioners prior to the August of 2021 hearing; however, petitioners failed to remedy those conditions. Additionally, the circuit court heard evidence that the children had continued contact with the mother, in violation of the circuit court's prior orders. The children informed the author of the DHHR's IIU report and the guardian that they had contact with the mother subsequent to the termination of the mother's parental rights. Finally, the DHHR's IIU report included extremely concerning statements from the children that the children were not permitted to talk about the conditions of petitioners' home. The children stated that they were not allowed to talk about the conditions in the home or contact with their parents.

Although petitioners denied many of the allegations during their testimony, the circuit court found that their testimony was not credible. "A reviewing court cannot assess witness credibility through a record. The trier of fact is uniquely situated to make such determinations and this Court is not in a position to, and will not, second guess such determinations." *Michael D.C. v. Wanda L.C.*, 201 W. Va. 381, 388, 497 S.E.2d 531, 538 (1997). On appeal, petitioners argue that the circuit court's credibility determinations were erroneous because the circuit court did not provide their counsel access to the court file, accepted a proffer from the guardian as to issues of fact, and admitted the DHHR's IIU report without providing petitioners an opportunity to cross-examine its author. However, as discussed above, petitioners were entitled to a "meaningful opportunity to be heard" but not entitled to cross-examine witnesses. The circuit court was within its discretion to weigh petitioners' credibility in light of the other evidence before it, specifically the corroborating information from the DHHR's IIU report and the guardian as to the condition of the children that contradicted petitioners' self-serving testimony. Upon our review of the record provided, we find that the circuit court's denial of petitioners' motion for placement of the children is not erroneous, and petitioners are entitled to no relief on appeal.

For the foregoing reasons, we find no error in the decision of the circuit court, and its November 18, 2021, order is hereby affirmed.

Affirmed.

**ISSUED**: May 12, 2022

**CONCURRED IN BY**:

Chief Justice John A. Hutchison
Justice Elizabeth D. Walker
Justice Tim Armstead
Justice William R. Wooton
Justice C. Haley Bunn

7